UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| DAVID BARRIE, et al., On Behalf of Themselves and All Others Similarly Situated, | § § § | Civil Action No. 3:01-cv-1071-K |
| | § § | (Consolidated with Nos. 3:01-cv-1087-K; 3:01-cv-1152-K and 3:01-cv-1203-K) |
| Plaintiffs, | § § | |
| vs. | § § | CLASS ACTION |
| INTERVOICE-BRITE, INC., et al., | § § | |
| Defendants. | § § § | |
| | § | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ........................................................................1

II. STATEMENT OF FACTS COMMON TO ALL CLASS MEMBERS............................2

III. THE PROPOSED CLASS REPRESENTATIVES ...........................................7

IV. ARGUMENT ........................................................................................7

    A. This Action Should Be Certified as a Class Action Pursuant to Rule 23 of the Federal Rules of Civil Procedure .........................................................7

        1. Courts in this Circuit Favor Class Certification of Securities Fraud Actions .........................................................................................7

        2. The Class Certification Determination Is Not an Inquiry into the Merits of the Case .........................................................................8

    B. The Proposed Class Satisfies the Requirements for Certification Under Rule 23(a).................................................................................................8

        1. The Class Is So Numerous that Joinder of All Members Is Impracticable....................................................................................9

        2. There Are Common Questions of Law or Fact.........................................10

        3. The Proposed Class Representatives' Claims Are Typical.......................11

        4. The Proposed Class Representatives Will Adequately Protect the Interests of the Class ....................................................................13

    C. This Action Satisfies Rule 23(b)(3) .........................................................15

        1. Common Questions of Law or Fact Predominate....................................15

        2. Reliance – Fraud on the Market.........................................................16

        3. The Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action .........................................19

V. CONCLUSION....................................................................................21

VI.    STATEMENT OF COMPLIANCE WITH LOCAL RULES ...........................................21

    A.    Local Rule 7.1 ...........................................................................................21

    B.    Local Rule 23.2 .........................................................................................21

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adams v. Reagan*,
    791 S.W.2d 284 (Tex. App. Fort Worth 1990)..................................................................19

*Basic Inc. v. Levinson*,
    485 U.S. 224 ............................................................................................................................16

*Bell v. Ascendant Solutions, Inc.*,
    422 F.3d 307 (5th Cir. 2005) ..........................................................................8, 16, 18

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ...........................................................................................13

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
    242 F.3d 290 (5th Cir. 2001) .............................................................................................8

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...................................................................................10, 19

*Cammer v. Bloom*,
    711 F. Supp. 1264, 1292 (D.N.J. 1989) ..............................................................17, 18

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ...............................................................................................8

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. ___, 125 S. Ct. 1627 (2005)...........................................................................14

*Durrett v. John Deere Co.*,
    150 F.R.D. 555 (N.D. Tex. 1993) ............................................................................16, 19

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)..............................................................................................................8

*Forbush v. J.C. Penney Co.*,
    994 F.2d 1101 (5th Cir. 1993) ........................................................................................10

*Greenwald v. Integrated Energy, Inc.*,
    102 F.R.D. 65 (S.D. Tex. 1984).......................................................................................10

*Henry v. Cash Today, Inc.*,
    199 F.R.D. 566 (S.D. Tex. 2000).......................................................................... *passim*

*In re Bank One Sec. Litig./First Chi. S'holder Claims*,
　　No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 9, 2002)...........................18

*In re Dynegy, Inc. Sec. Litig.*,
　　226 F.R.D. 263 (S.D. Tex. 2004) .......................................................................................2

*In re Electronic Data Sys. Corp. Sec. Litig.*,
　　226 F.R.D. 559 (E.D. Tex. 2005) .......................................................................................2

*In re Firstplus Fin. Group, Inc. Sec. Litig.*,
　　Civ. Action No. 3:98-CV-2551-M, 2002 U.S. Dist. LEXIS 20446
　　(N.D. Tex. Oct. 23, 2002) ..................................................................................................2

*In re Lease Oil Antitrust Litig.*,
　　186 F.R.D. 403 (S.D. Tex. 1999) .......................................................................................8

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　　199 F.R.D. 119 (S.D.N.Y. 2001) ............................................................................12, 13

*In re Reliant Sec. Litig.*,
　　No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex. Feb. 18, 2005) ............... *passim*

*In re THQ, Inc. Sec. Litig., No. CV 00-1783 AHM (Ex)*,
　　2002 U.S. Dist. LEXIS 7753 (C.D. Cal. Mar. 22, 2002) ..................................................19

*In re Texas Int'l Sec. Litig.*,
　　114 F.R.D. 33 (W.D. Okla. 1987) .....................................................................................19

*In re  Xcelera.com Sec. Litig.*,
　　430 F.3d 503 (1st Cir. 2005) .............................................................................................16

*Keasler v. Natural Gas Pipeline Co.*,
　　84 F.R.D. 364 (E.D. Tex. 1979)........................................................................................19

*Keele v. Wexler*,
　　149 F.3d 589 (7th Cir. 1998) ............................................................................................11

*King v. Kansas City S. Indus., Inc.*,
　　519 F.2d 20 (7th Cir. 1975) ..............................................................................................19

*Lagrasta v. First Union Sec., Inc.*,
　　No. 2:01-cv-251-FTM-29DNF, 2005 U.S. Dist. LEXIS 20207
　　(M.D. Fla. Aug. 8, 2005) ..................................................................................................14

*Lehocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004)............................................................2, 13

*Levitan v. McCoy*, No. 00 C 5096, 2003 U.S. Dist. LEXIS 5078
  (N.D. Ill. Mar. 28, 2003).........................................................................19

*Lightbourn v. County of El Paso*,
  118 F.3d 421 (5th Cir. 1997) ..............................................................10, 11

*Ligon v. Frito-Lay, Inc.*,
  82 F.R.D. 42 (N.D. Tex. 1979) ................................................................12

*Longden v. Sunderman*,
  123 F.R.D. 547 (N.D. Tex. 1988) .................................................12, 15, 19

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)....................................................................................9

*Oscar Private Equity Invs. v. Holland*,
  Civ. No. 3:03-CV-2761-H, 2005 U.S. Dist. LEXIS 6525
  (N.D. Tex. Apr. 15, 2005)......................................................................2, 7

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..............................................................................7, 20

*Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*,
  637 F.2d 1014 (5th Cir. 1981) ................................................................12

*Rubenstein v. Collins*,
  162 F.R.D. 534 (S.D. Tex. 1995)........................................................10, 13

*Stirman v. Exxon Corp.*,
  280 F.3d 554 (5th Cir. 2002) ..................................................................12

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) .............................................................16, 18

*Watson v. Shell Oil Co.*,
  979 F.2d 1014 (5th Cir. 1992) ..................................................................9

*Weeks v. Bareco Oil Co.*,
  125 F.2d 84 (7th Cir. 1941) .....................................................................20

*Weinberger v. Thornton*,
 114 F.R.D. 599 (S.D. Cal. 1986) ...................................................................20

*Wilson v. Collecto, Inc.*,
 No. 03 C 4673, 2004 U.S. Dist. LEXIS 3074
 (N.D. Ill. Feb. 24, 2004),........................................................................10

*Zeidman v. J. Ray McDermott & Co.*,
 651 F.2d 1030 (5th Cir. 1981) ...................................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
 §78u-4(a)(3) ...........................................................................................1

Federal Rules of Civil Procedure
 Rule 23 ...................................................................................... *passim*
 Rule 23(a)................................................................................. *passim*
 Rule 23(a)(1) ............................................................................23
 Rule 23(b) ..................................................................................23
 Rule 23(b)(3).............................................................................2

Lead plaintiffs Cary Alan Luskin and Debbie Luskin, by their undersigned attorneys, respectfully submit this memorandum of law in support of the accompanying motion for class certification.[1]

## I.    PRELIMINARY STATEMENT

This is a securities class action on behalf of persons who purchased the common stock of InterVoice-Brite, Inc. ("InterVoice" or the "Company") between October 12, 1999 through and including June 6, 2000 (the "Class Period"), against InterVoice and certain of its senior officers and directors.  Lead plaintiffs seek an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of all persons and entities who purchased or otherwise acquired InterVoice's common stock during the Class Period.  Lead plaintiffs also seek the appointment of designated representatives and their counsel of record.

The Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") alleges that during the Class Period, defendants violated §§10(b) and 20(a) of the Exchange Act by deliberately and/or recklessly misleading the public about the Company's August 1999 merger with BriteVoice Systems, Inc. ("Brite"), its 4Q00 and fiscal year 2001 earnings and revenue projections and its fiscal year 2000 year-end earnings and revenue results.[2]  ¶¶18-126.[3]

This action satisfies all of the requirements of Fed. R. Civ. P. 23.  The proposed Class is so numerous that joinder of all members is impracticable; there are questions of fact or law common to

---

[1]    On September 5, 2001, the Court appointed Cary Alan Luskin and Debbie Luskin as lead plaintiffs pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78u-4(a)(3)(B).  The Court also approved lead plaintiffs' selection of lead counsel pursuant to §21D(a)(3)(B)(v) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B)(v).

[2]    InterVoice's fiscal year began on March 1, 1999 and ended on February 29, 2000, with quarters ending May 31, 1999, August 31, 1999, November 30, 1999, and February 29, 2000.

[3]    Unless otherwise indicated, all paragraph ("¶") references are to the Complaint.

the Class which predominate over any questions affecting only individual members; the claims or defenses of the representative parties are typical of the claims or defenses of the Class; the representative parties will fairly and adequately protect the interests of the Class; and a class action is the superior means to resolve the issues raised by this case.

Courts in the Fifth Circuit routinely certify securities fraud cases for class action treatment. *Oscar Private Equity Invs. v. Holland*, Civ. No. 3:03-CV-2761-H, 2005 U.S. Dist. LEXIS 6525 (N.D. Tex. Apr. 15, 2005); *In re Electronic Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559 (E.D. Tex. 2005); *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex. Feb. 18, 2005); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263 (S.D. Tex. 2004); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004); *In re Firstplus Fin. Group, Inc. Sec. Litig.*, Civ. Action No. 3:98-CV-2551-M, 2002 U.S. Dist. LEXIS 20446 (N.D. Tex. Oct. 23, 2002).

The foregoing certified cases are substantially similar to this case. Each involves financial schemes, false and misleading statements and/or omissions of material facts which caused numerous investors to purchase stock at inflated prices during the Class Period. Classes were certified despite the fact that investors purchased different amounts of stock, on different days during the Class Period, after different information reached the market, based on the fraud-on-the-market presumption of reliance. Accordingly, lead plaintiffs' motion for class certification should be granted.

## II.    STATEMENT OF FACTS

This is a securities class action brought on behalf of persons who purchased the common stock of InterVoice between October 12, 1999 and June 6, 2000 against InterVoice and certain of its senior officers and directors for violation of the federal securities laws arising out of defendants' false and misleading statements concerning the Company's August 1999 merger with Brite, its 4Q00

and fiscal year 2001 earnings and revenue projections and its fiscal year 2000 year-end earnings and revenue results. ¶¶18-126.

InterVoice commenced operations in 1984. ¶18. Until early 1999, the Company's emphasis has been on Interactive Voice Response ("IVR") systems marketed to financial institutions, universities and government agencies. *Id.* By early 1999, however, the IVR market was flattening and beginning to decline. ¶20. In April 1999, InterVoice agreed to acquire Brite for an aggregate purchase price of $174.3 million in cash and stock. *Id.* In addition to sales of call automation systems, Brite provided automated call processing services and generated service revenue by charging its customers fees for these services either by fixed rate, monthly or by transaction. *Id.* Prior to the merger, InterVoice sales were 70% Business Systems (IVR) and 30% Network Systems. Brite sales, on the other hand, were 70% Network Systems and 30% IVR Systems.

A successful merger with Brite would thus allow InterVoice to offset the effect of a declining demand for its IVR systems and benefit from Brite's strong Network Systems and Services and European customer base. The combined company would sell products in two market segments: (a) Business Systems which included IVR systems products; and (b) Network Systems which focuses on systems for the telecommunications network customers. *Id.*

The merger was a disaster. ¶¶23-34. However, in order to create the appearance that the merger was successful, defendants falsely maintained that (a) the merger had and would continue to result in strong revenues and earnings; (b) former Brite customers were making the transition to InterVoice's NT IVR platform; (c) the Company's backlog of orders and pipeline for new business was strong; and (d) the Company was on track to report $0.76+ and $1.25 earnings per share ("EPS") in fiscal year 2000 and fiscal year 2001, respectively. *Id.* As a result, the Company stock price grew from $11.00 per share in October 1999 to $38.00 per share in March 2000, a 300% increase in only four months. ¶¶2, 35-73.

On June 6, 2000, only one month after reaffirming the strong demand for InterVoice products at road shows in New York and Philadelphia, InterVoice shocked investors by revealing that the Company had, in fact, been "impacted by sales staff attrition . . ." and as a result, instead of $89 million in projected predicted revenues, the Company would only report $67-$68 million – a $20 million shortfall. ¶¶92-94. Analysts initially reduced their estimates for the Company from $1.19 EPS to $0.60 EPS. ¶¶95-97. However, within **one day** and after talking with management, the ***earnings forecasts were reduced for the entire fiscal year to $0.00.*** ¶¶6, 98-103. Thus, the "attrition" problem that the Company sought to limit to 1Q01 was far more extensive and wiped out the entire year's earnings. On this news, InterVoice's stock collapsed to as low as $5.75 per share, before closing at $6.125 per share on June 7, 2000, a drop of 55% from the stock's close of $13.5625 per share on June 6, 2000. ¶¶7, 95.

In fact, as lead plaintiffs allege, defendants failed to disclose that in truth:

(a)     The merger had resulted in massive attrition and firing of the Brite sales force including Brite's strong Network System sales team. ¶¶3, 26.

(b)     The Company had discontinued support and development of UNIX platform systems that Brite had sold to its customers and demanded that those customers transition to InterVoice's NT based platform. When forced to make a choice, however, many of Brite's former customers elected to cancel accounts with the Company and patronize InterVoice competitors. ¶24.

(c)     The Company's strong fiscal year 2000 (ending February 29, 2000) revenue and earnings were the result of recognizing revenue on sales of its software products in violation of generally accepted accounting principles ("GAAP") and American Institute of Certified Public Accountants Statement of Position 97-2 ("SOP 97-2"). ¶¶109-123.

Defendants also misrepresented the impact of the United States Securities and Exchange Commission ("SEC") accounting staff's issuance of Staff Accounting Bulletin No. 101 ("SAB 101")

which was issued in December 1999. Defendants knew that with the issuance of SAB 101 the SEC was focused on improper accounting and adherence to SAB 101 would uncover the improper way that the Company accounted for its software sales in violation of GAAP and SOP 97-2. Nevertheless, defendants falsely assured investors that the Company had continuously adhered to accounting rules, and that SAB 101 would have no economic impact to its operations and no major impact in reporting revenue recognition on software shipments. In fact, the Company tried to "come clean" using SAB 101 to cover the improper accounting. *Id.*

On June 22, 2000, the Company admitted that because of its "implementation" of SAB 101 it would have to reverse its 4Q00 financial results by taking an $18 million before-tax charge to revenues for 4Q00 to account for sales of software which the Company recognized at the time of shipment in violation of GAAP and SOP 97-2 on contract arrangements that required installation and customer acceptance. ¶¶104, 109-123.

In fact, more recently, the Company essentially admitted that it had falsified its accounting in order to meet analyst expectation during and after the Class Period.

In InterVoice's 2005 SEC filings the Company announced that in August 2004, the Audit Committee began an investigation into the Company's accounting during the years 2000 through 2002. In May 2005, InterVoice admitted that the Audit Committee had found that the Company: (a) improperly recognized revenue in 2000-2002; (b) falsified transactions at the end of quarters (including 4Q00), which enabled the Company to meet analyst expectations and at least one of those transactions involved "intentional misconduct"; and (c) these transactions are the subject of an ongoing investigation being conducted by the SEC:

> In December 2004, our Audit Committee completed an investigation it had begun in August 2004 of certain transactions *occurring during our fiscal years 2000 through 2002*. . . .

> The Audit Committee investigation found that we accounted for certain transactions incorrectly during our fiscal years 2000 through 2002. The Audit

Committee investigation concluded that a $900,000 payment made by InterVoice to a publicly held supplier purportedly for certain prepaid licenses . . . . ***As a result, we believe the $900,000 payment should have been recorded as a reduction in the $21.4 million gain we recognized on the sale of the shares*** underlying the warrant during the fourth quarter of fiscal 2001 and should not have been recorded as prepaid license inventory. . . . ***The Audit Committee investigation also found that we intentionally provided the same supplier false or misleading documents for such supplier to use to support such supplier's improper recognition of revenue*** in calendar 2001.

In addition, the Audit Committee investigation and review found that ***six of the seven customer sales transactions the Committee investigated were accounted for incorrectly and that there was intentional misconduct in at least one of those sales transactions. These six transactions occurred at the end of quarters in which we just met analysts' expectations with respect to earnings per share***. The Audit Committee found that ***we improperly recognized revenue in a quarter-end barter transaction involving approximately 0.4% of annual revenues for fiscal 2000, and that we improperly accelerated the recognition of revenue in five quarter-end transactions totaling approximately 0.4% and 0.3% of annual revenues in fiscal 2000 and fiscal 2002, respectively***. . . .

Later, on July 8, 2005, the Company on its Report on Form 10-Q admitted that the accounting shenanigans continue to be discovered through the current investigation being done by the SEC:

In addition, as a result of work performed in responding to the SEC subpoena, the Committee has concluded that InterVoice improperly recognized approximately $5.4 million of revenue in two sales transactions during the second and third quarters of fiscal 2002 because the transactions were subject to oral side agreements that gave our customer expanded rights of return. We subsequently reversed the $5.4 million of revenue during the fourth quarter of fiscal 2002 in connection with a return of the related systems. Separately, the Audit Committee further determined that in September 2001 one of our current executive officers improperly communicated InterVoice information to a shareholder.

Most recently, in the Company's SEC Report on Form 10-Q filed on January 12, 2006, InterVoice reiterated the foregoing findings and added that "[the Company] and the SEC have agreed that InterVoice will not assert any defenses based on a statute of limitations with respect to any future claims by the SEC concerning the two transactions investigated by the Audit Committee that occurred during February 2000." In effect, this allows the SEC additional time beyond any arguable statute of limitations to decide whether to file charges in connection with these activities.

Thus, in addition to the documents, witnesses and expert testimony, this case is strongly supported by the Company's own admission of wrongdoing.

## III. THE PROPOSED CLASS REPRESENTATIVES

During the Class Period, proposed Class representatives Cary Alan Luskin and Debbie Luskin purchased 7450 and 500 shares of InterVoice stock respectively. As lead plaintiffs, Cary Alan Luskin and Debbie Luskin have already extended substantial time and effort, vigorously prosecuting this litigation on behalf of the proposed Class. They have ably represented the Class by overseeing and communicating with appointed lead counsel, and keeping apprised of the ongoing developments in the case. Under Cary Alan Luskin and Debbie Luskin's watch, lead plaintiffs have conducted an extensive investigation into defendants' fraudulent schemes and successfully defended against a motion to dismiss filed by defendants. Lead plaintiffs have also embarked on an ambitious discovery plan, propounding numerous document requests and interrogatories to defendants. Lead plaintiffs have also issued third-party subpoenas to external auditors Ernst & Young LLP. Cary Alan Luskin and Debbie Luskin have actively monitored this process as appointed lead plaintiff and are ready and willing to perform the duties of a Class representative in this case, including testifying at a deposition and responding to discovery requests.

## IV. ARGUMENT

### A. This Action Should Be Certified as a Class Action Pursuant to Rule 23 of the Federal Rules of Civil Procedure

#### 1. Courts in this Circuit Favor Class Certification of Securities Fraud Actions

It is widely recognized that a class action is a particularly appropriate mechanism for individual shareholders to obtain recovery in securities fraud cases. *See, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) (Class actions allow the "plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available."); *Oscar Private Equity Invs.*, 2005 U.S. Dist. LEXIS

6525, at *22 ("The Court is of the opinion that a class action is a superior method of adjudicating . . . " securities cases.).

### 2. The Class Certification Determination Is Not an Inquiry into the Merits of the Case

The determination of class certification is a procedural question defined by Fed. R. Civ. P. 23. It does not require an inquiry into the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (the question of whether a complaint has merit is independent of whether a class should be certified under Rule 23); *accord Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311 (5th Cir. 2005) citing *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) ("the strength of a plaintiff's claim should not affect the certification decision."[4] *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 297 n.29 (5th Cir. 2001) ("We do not consider the merits of a case when reviewing class certification."); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 419 (S.D. Tex. 1999) ("In evaluating a motion for class certification, however, the court does not have the authority to conduct a preliminary inquiry into the merits of the case, and hence the substantive allegations contained in the complaint are accepted as true.").

This case has all the elements of a certified class action. The proposed Class consists of hundreds, if not thousands, of investors who acquired InterVoice's stock over a nine month period and were damaged by the same fraudulent schemes, false and misleading statements and omissions of material facts. As set forth herein, class certification is appropriate because the proposed Class satisfies Fed. R. Civ. P. 23(a) and 23(b)(3).

### B. The Proposed Class Satisfies the Requirements for Certification Under Rule 23(a)

Rule 23(a) sets forth four prerequisites for class certification:

---

[4]      All emphasis is added, and all internal quotations, footnotes and citations are omitted, unless otherwise noted.

- 8 -

(1)     The Class is so numerous that joinder of all members is impracticable;

(2)     There are questions of law or fact common to the Class;

(3)     The claims or defenses of the representative parties are typical of the claims or defenses of the Class; and

(4)     The representative parties will fairly and adequately protect the interests of the Class.

Fed. R. Civ. P. 23(a).

These four requirements are commonly referred to as the "numerosity," "commonality," "typicality," and "adequacy" requirements. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). As demonstrated below, lead plaintiffs satisfy all four prerequisites of Rule 23(a).

## 1.     The Class Is So Numerous that Joinder of All Members Is Impracticable

The numerosity requirement is satisfied when a potential Class is so numerous that joinder of all members is impracticable. *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992). Because a reasonable estimate of the number of purported members satisfies the numerosity requirement, a precise numeration is not required for certification. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000) (Harmon, J.). As of May 2000, InterVoice had approximately 32 million shares outstanding. Members of the Class are scattered throughout the United States. ¶126. Moreover, in the Fifth Circuit, "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981).

The Class consists of those who purchased InterVoice's publicly traded securities during the Class Period. The exact number of class members is presently unknown and can be ascertained only through discovery. Based on the Company's reported shares outstanding and trading volume during the Class Period, however, lead plaintiff estimates there are thousands of class members nationwide.

*See Rubenstein v. Collins*, 162 F.R.D. 534, 537 (S.D. Tex. 1995) ("number of class members could extend into the thousands"); *Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 68 (S.D. Tex. 1984) (DeAnda, J.) ("Millions of . . . shares were traded, presumably to a great many investors during the class period. Clearly joinder of all plaintiffs would be impractical."). Accordingly, the proposed Class is sufficiently numerous to make joinder of all members impracticable.

## 2. There Are Common Questions of Law or Fact

Under Rule 23(a)(2), questions of law or fact common to the Class must predominate over questions pertaining to individual members. As courts have held, this "is not a high burden." *Henry* 199 F.R.D. at 569. Commonality is satisfied "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997); *accord Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993). However, "[t]he rule does not require perfect harmony throughout the class. 'The presence of some factual variations among class members' experiences will not defeat class certification." *Wilson v. Collecto, Inc.*, No. 03 C 4673, 2004 U.S. Dist. LEXIS 3074, at *7 (N.D. Ill. Feb. 24, 2004); *Reliant*, 2005 U.S. Dist. LEXIS 9716, at *20. Indeed, in *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975), the court confirmed this principle:

> Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie*, 524 F.2d at 902.

Lead plaintiffs satisfy the "commonality" requirement of Rule 23(a)(2). First, lead plaintiffs share the following common issues of law and fact with all other potential members of the Class: (a) whether the federal securities laws were violated by defendants' misconduct; (b) whether defendants' undisclosed schemes, false statements and omissions of material facts misrepresented

the business, financial and operational results and future performance of the Company; (c) whether defendants acted willfully, knowingly, or recklessly in concealing their schemes and misrepresenting and omitting material facts; (d) whether the market price of the Company's common stock was artificially inflated during the Class Period due to defendants' schemes, material misrepresentations, deceptions and nondisclosures; and (e) whether the members of the Class sustained economic loss causally connected to defendants' misconduct, and if so, the proper measure of such damages.

Further, all class members share a common nucleus of facts and were damaged by defendants' "standardized conduct" during the Class Period. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Defendants' fraudulent accounting schemes, insider selling, and false and misleading statements and omissions to the market inflated the Company's stock price and injured class members in a uniform manner. ¶¶18-126.

Specifically, the Complaint identifies nine months of false financial results, earnings projections and misrepresentations which were not fully disclosed to the market until after the Class Period. *Id*. Lead plaintiffs, like other class members, purchased InterVoice shares based on the integrity of the market when defendants' misconduct was reflected in InterVoice's stock price. This common nucleus of facts and law unite all class members, irrespective of when and how many shares they purchased. Nothing more is required to show commonality under Rule 23(a)(2). *Reliant*, 2005 U.S. Dist. LEXIS 9716, at *20. Because the Class is bound by its common interest of determining whether defendants' conduct is actionable, based on common questions of law concerning the significance of common facts under federal law and state law, the commonality requirement is satisfied.

### 3. The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires class representatives to present claims that are typical of the Class. "The test for typicality, like the test for commonality, is not demanding." *Lightbourn*, 118 F.3d at

426. "The court focuses on the legal and remedial theories of the named plaintiffs and the class members they seek to represent." *Henry*, 199 F.R.D. at 569. "'The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Longden v. Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988). But the typicality "requirement . . . does not mean that all claims must be identical." *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981); *accord Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002); *Ligon v. Frito-Lay, Inc.*, 82 F.R.D. 42, 47 (N.D. Tex. 1979) ("'A class representative and a class member must be similarly, not identically, situated.'"). "In fact, the named representatives only need to be adequate and do not need to be the best or most typical of all possible representatives." *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 123 (S.D.N.Y. 2001).

Lead plaintiffs' claims are typical under Rule 23(a)(3). As set forth in the "commonality" section above, lead plaintiffs seek to recover damages caused by the same fraudulent account schemes, materially false and misleading statements and omissions concealed from the investing public. Defendants' common schemes and "standardized" course of wrongful conduct caused damage to class members who purchased shares at artificially inflated prices during the Class Period. Lead plaintiffs, like all other class members, suffered economic losses from their transactions in InterVoice's stock when the artificial inflation was removed from the stock price through, *inter alia*, partial disclosures of adverse facts concerning the true financial state of the Company. ¶¶92-103. The proposed Class representatives' claims are typical because they arise from defendants' common scheme and course of conduct engineered to artificially impact the market price for InterVoice's publicly traded stock. Lead plaintiffs' claims arise from their investment in InterVoice securities. "'[W]here the public market of a quoted security is polluted by false information, or where price,

supply and demand are distorted as a result of misleading omissions, all types of investors are injured.'" *Oxford Health*, 199 F.R.D. at 124. Therefore, lead plaintiffs' claims are typical "because they invested in [InterVoice] . . . just as the potential class members did." *Rubenstein*, 162 F.R.D. at 538. Simply put, lead plaintiffs' claims are typical under Rule 23(a)(3) because "'the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories.'" *Reliant*, 2005 U.S. Dist. LEXIS 9716, at *22, citing *Lehocky*, 220 F.R.D. 491 at 500. Nothing more is required to satisfy the typicality element of Rule 23(a)(3).

### 4. The Proposed Class Representatives Will Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." This requirement has three elements: (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have sufficient interest in the outcome to ensure vigorous advocacy; and (3) designated counsel must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001).

Lead plaintiffs satisfy the "adequacy" requirements of Rule 23(a)(4). First, there are no conflicts of interest between lead plaintiffs and the other members of the Class. As set forth above, lead plaintiffs, like the other class members, purchased artificially inflated shares of InterVoice's stock and were damaged as a result of defendants' common course of fraudulent conduct during the Class Period. Lead plaintiffs will have to prove the same legal theory and standardized conduct as the absent class members to establish defendants' liability. Further, there are no defenses unique to lead plaintiffs.

With respect to loss causation, all class members, including lead plaintiffs, purchased artificially inflated shares of InterVoice's stock and were damaged when the inflation was removed gradually, and sometimes precipitously, from the stock price. Although lead plaintiffs must

eventually prove that their economic loss was causally connected to defendants' misconduct (*see Dura Pharms., Inc. v. Broudo*, 544 U.S. ___, 125 S. Ct. 1627 (2005) ("*Dura*")), that requirement is subject to classwide proof and does not defeat class certification. *See Lagrasta v. First Union Sec., Inc.*, No. 2:01-cv-251-FTM-29DNF, 2005 U.S. Dist. LEXIS 20207, at **21-22 (M.D. Fla. Aug. 8, 2005) (certifying class in securities fraud case post-*Dura* decision and stating: "Plaintiffs have asserted, and there is sufficient evidence at this stage of the proceedings to establish, that the misrepresentations or omissions were in some reasonably direct or proximate way responsible for their loss, *i.e.*, that there is a proximate relationship between the loss and the misrepresentation."). Lead plaintiffs have already sufficiently demonstrated the "proximate relationship" between their losses and defendants' misconduct. Accordingly, there are no unique loss causation defenses here that would defeat class certification.

With respect to the second adequacy prong, lead plaintiffs have sufficient interest in the outcome to ensure vigorous advocacy. As set forth above, lead plaintiffs have already demonstrated its interest and vigor by actively prosecuting this case. In their capacity as lead plaintiffs they have been monitoring and consulting with lead counsel in the prosecution of this case. Thus, lead plaintiffs meet the second adequacy prong of Rule 23(a)(4).

Finally, lead plaintiffs are also adequate because they have retained attorneys with considerable experience in securities fraud class actions and complex litigation. The proposed Class is represented by Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"), whose attorneys have been appointed as Class counsel in hundreds of securities class actions.[5] The

---

[5] On September 5, 2001, this Court approved lead plaintiffs' selection of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") as lead counsel. On May 1, 2004, the west coast operations of Milberg Weiss became Lerach Coughlin. The individual attorneys who have litigated this case since its inception joined Lerach Coughlin and remain active on the case.

firm resume for lead counsel evidences its ability to vigorously prosecute this action with the proposed Class representatives. *See* Declaration of Jeffrey W. Lawrence in Support of Lead Plaintiffs' Motion for Class Certification ("Lawrence Decl."), Ex. 1. Liaison counsel Stanley, Mandel & Iola, L.L.P. is also qualified and experienced in the prosecution of securities class actions. *See* Lawrence Decl., Ex. 2. There can be no legitimate dispute that lead counsel is qualified, experienced and capable of prosecuting this litigation on behalf of the Class.

Lead plaintiffs have no conflicts of interest and have retained competent counsel. Accordingly, lead plaintiffs are adequate Class representatives under Rule 23(a)(4).

**C.      This Action Satisfies Rule 23(b)(3)**

Lead plaintiffs seek certification under Rule 23(b)(3), which states that an action may be maintained as a class action if:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The issues to consider under Rule 23(b)(3) are predominance and superiority. *See Henry*, 199 F.R.D. at 570. These requirements also are satisfied.

**1.      Common Questions of Law or Fact Predominate**

Predominance, in the context of Rule 23, means that those issues or defenses claimed on behalf of the Class ought to be superior to, and unencumbered by, any individual claims or issues that may affect the lawsuit. Rule 23 does not require each issue in the case to be similar to all class members, only that common questions predominate over individual issues. *Longden*, 123 F.R.D. at 556.

Because the commonality and typicality requirements are met, common issues predominate in this action. All of the asserted claims arise from the same fraudulent scheme that affected all proposed class members. That is, because the Class was subjected to the same alleged misrepresentations and omissions, which fit within a common course of conduct, common questions predominate and a class action is appropriate. *Durrett v. John Deere Co.*, 150 F.R.D. 555, 560 (N.D. Tex. 1993).

In this case, defendants' liability arises from their fraudulent accounting schemes and dissemination of materially false and misleading statements and omissions to the market during the Class Period. The issues that predominate are whether defendants were reckless in engaging in material undisclosed schemes, misrepresentations and omissions. *See In re Bank One Sec. Litig./First Chi. S'holder Claims*, No. 00 CV 0767, 2002 U.S. Dist. LEXIS 8709, at *22 (N.D. Ill. May 9, 2002) ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue."). Accordingly, common questions of law or fact predominate over individual issues. Lead plaintiffs have satisfied Rule 23(b)(3).

### 2. Reliance – Fraud on the Market

Lead plaintiffs rely on the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson* to obtain the benefit of a class-wide presumption of reliance. The fraud-on-the-market presumption provides that "reliance may be presumed, enabling Rule 10b-5 class actions to proceed, when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Basic Inc.*, 485 U.S. 224; *see also Bell*, 422 F.3d at 310; *Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005).

In this case InterVoice's publicly traded securities clearly traded in an efficient market. The relevant factors for determining market efficiency include: (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following

and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the Company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the Company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock. *Bell*, 422 F.3d at 313. Under each of these factors it is clear that the market for InterVoice stock was efficient.

The cause and effect relationship between unexpected information released to the market is the essence of an efficient market and the foundation for the fraud on the market theory. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir. 2005) (stating that the cause and effect relationship between pricing and new information is implicit in an efficient market). The movement of InterVoice's stock price during the Class Period when unexpected news was disseminated shows that InterVoice's stock traded in an efficient market. For example, when analysts reduced their earnings forecasts after talking with management, InterVoice's stock collapsed, closing at $6.13 on June 7, 2000, a drop of almost 55% from the stock's close of $13.56 per share on June 6, 2000. Lead Plaintiffs' Declaration of Bjorn I. Steinholt in Support of Motion for Class Certification ("Steinholt Decl."), ¶21. This rapid reaction to unexpected news clearly shows that InterVoice traded in an efficient market. *Id.* Thus the most significant factor indicates that the market for InterVoice stock was efficient.

The other factors also indicate that InterVoice traded in an efficient market. InterVoice's stock traded at an average weekly volume of over three million shares during the Class Period. Steinholt Decl., ¶13; Ex. B. This represented over 9% of the outstanding shares which is more than *four times* the volume amount courts have found sufficient to raise of "strong presumption" of market efficiency. *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989). Second, twelve

securities analysts covered and reported on InterVoice during the Class Period, including U.S. Bancorp Piper Jaffray Inc., Jeffries & Co., and Ladenburg Thalman & Co. Inc., Steinholt Decl., ¶15; Ex. C. Such wide analyst coverage is an indicator of market efficiency for several reasons: it provides definitive evidence that securities analysts in fact did monitor InterVoice and provided investors with investment research on the Company; it shows that there was enough demand from investors for research on InterVoice to provide an economic justification for doing the investment research on the Company. *See* Steinholt Decl. at 15. Third, there were over 225 market makers in InterVoice stock during the Class Period enabling rapid and efficient trading. Steinholt Decl., ¶17; Ex. D. Fourth, the Company was eligible to file an SEC registration Form S-3 during the Class Period. Steinholt Decl., ¶19. Each of the *Cammer* facts strongly establish market efficiency in InterVoice stock. Steinholt Decl., ¶32.

The presence of sophisticated investors is another important factor ensuring that a security is traded in an efficient market because the market value of these investments held by the large institutions provided an economic incentive for them to monitor their InterVoice investment and take appropriate investment action when necessary. During the Class Period large institutions, among the most sophisticated investors in the market owned millions of shares of InterVoice stock. Steinholt Decl., ¶24. Additionally, all other relevant factors typically used to evaluate market efficiency also traded in an efficient market. The low transaction cost for trading the stock (Steinholt Decl., ¶29), InterVoice's market capitalization of up to $1.2 billion during the Class Period (Steinholt Decl., ¶28), and the presence of significant short interest in the stock (Steinholt Decl., ¶18), all provide further support for the conclusion that InterVoice stock traded in an efficient market.

These factors, as well as the *Cammer* factors above, are more than sufficient to establish that InterVoice stock traded on an efficient market during the Class Period. *Unger*, 401 F.3d at 323. No further showing is required beyond this rigorous, though preliminary, standard of proof. *Bell*, 422

F.3d at 313.  Indeed,  all that is required is a preliminary showing on competent, admissible evidence.  *Id*. at 314.  Lead plaintiffs have satisfied this requirement.

### 3.   The Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

The class action device is a superior method for resolving plaintiffs' claims because it provides the fairest and most efficient adjudication.  Simply stated, securities class actions are both cost effective and manageable.  "The availability of the class action to redress such frauds has been consistently upheld."  *Blackie*, 524 F.2d at 903; *see also Durrett,* 150 F.R.D. at 560.[6]

Class certification here is useful and necessary.  Courts in the Fifth Circuit recognize the efficacy of the class action device for redressing injury to large groups of individuals harmed by a common set of operative facts.  "It is desirable that securities fraud cases involving a large number of plaintiffs with small individual claims proceed as class actions."  *Keasler v. Natural Gas Pipeline Co.*, 84 F.R.D. 364, 368 (E.D. Tex. 1979); *Longden*, 123 F.R.D. at 551.  Class representation is the only way to afford relief to those plaintiffs whose claims are too small to permit them to bring individual suits.  *Henry*, 199 F.R.D. at 573; *see also Levitan v. McCoy*, No. 00 C 5096, 2003 U.S. Dist. LEXIS 5078, at *6 (N.D. Ill. Mar. 28, 2003) ("'securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits'").  That thousands of plaintiffs lost a considerable amount of money in connection with the scheme alleged is perfectly consistent with the fact that many more class members sustained losses not substantial enough to justify independently prosecuting their claims.  Thus, to deny class

---

[6]      *See also King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25-26 (7th Cir. 1975); *In re THQ, Inc. Sec. Litig.*, No. CV 00-1783 AHM (Ex), 2002 U.S. Dist. LEXIS 7753, at *8 (C.D. Cal. Mar. 22, 2002); *In re Texas Int'l Sec. Litig.*, 114 F.R.D. 33, 39-40 (W.D. Okla. 1987); *Adams v. Reagan*, 791 S.W.2d 284, 292 (Tex. App. Fort Worth 1990) ("a class action is a particularly well-suited method of adjudicating a securities fraud action" under the Texas Securities Act).

certification would be to "clos[e] the door of justice to all small claimants." *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 90 (7th Cir. 1941).

Moreover, the class action device offers judicial efficiency because it permits common claims and issues to be tried once, with binding effect on all parties. The number of prospective class members here is far too numerous, and the underlying factual and legal issues far too similar, to rationally argue that plaintiffs' claims ought to be heard independently of one another. Indeed, "[t]he recognized purpose of the class action is to provide a mode of relief to those who have been injured by a fraudulent scheme such as that alleged here." *Weinberger v. Thornton*, 114 F.R.D. 599, 605 (S.D. Cal. 1986).

Here, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, defendants face potentially hundreds of individual lawsuits, all arising out of the same set of operative facts. The resolution of common issues alleged in this class action is an efficient use of judicial resources and will result in a single outcome that is binding on all defendants and class members. *See, e.g., Shutts*, 472 U.S. at 809 (class action mechanism allows plaintiffs to pool claims that would otherwise be uneconomical to litigate individually). Any administrative difficulties in handling potential individual issues that may arise in this litigation are less burdensome than the problems which are likely to arise in administering hundreds of separate actions. Finally, because of the prohibitive expenses of maintaining individual actions, denial of class certification here would effectively prevent numerous individuals from asserting their claims against defendants and weaken the protections provided to investors under the federal securities laws. Simply put, "Rule 23 was designed for this exact type of case." *Reliant*, 2005 U.S. Dist. LEXIS 9716, at *20. The proposed Class satisfies the requirements of Rule 23(b)(3).

## V.  CONCLUSION

For the reasons set forth herein, an Order should be entered (i) certifying this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure; (ii) appointing lead plaintiffs as class representatives; and (iii) appointing lead counsel, Lerach Coughlin as Class counsel and Stanley, Mandel & Iola, L.L.P. as liaison counsel.

## VI.  STATEMENT OF COMPLIANCE WITH LOCAL RULES

### A.  Local Rule 7.1

The parties to this case held several conferences during which it was determined that any motion for class certification would be opposed.  Accordingly, the parties have agreed the Court ordered that lead plaintiffs' class certification would be filed on February 3, 2006.

### B.  Local Rule 23.2

(a)  The appropriate sections of Fed. R. Civ. P. 23 under which the suit is properly maintainable as a class action:

The lead plaintiffs believe that this case is particularly appropriate for class certification under Section 23(a) and 23(b)(3).  Lead plaintiffs are proper class representatives and the claims are particularly well suited for class treatment. The basis for this conclusion is set forth throughout the brief.

(b)  Specific factual allegations concerning the alleged class, including:

1.  The approximate number of class members:

Because lead plaintiffs do not have access to the shareholder lists it is not possible to determine the number of class members. However, given that there were over 30 million shares outstanding as of May 2000 and there were in excess of 600,000 shares traded on average per week during the Class Period, lead plaintiffs believe and allege that the class member number is in the thousands.

2.  The definition of the Class and any subclasses:

The Class is defined as all shareholders who purchased or otherwise acquired InterVoice common stock from October 12, 1999 through and including June 6, 2000. Excluded from the Class are defendants herein, members of the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director or other entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

3.      The distinguishing and common characteristics of class members, such as geography, time, and common financial incentives:

All of the class members purchased or otherwise obtained their shares on the NASDAQ stock exchange and suffered damages and economic loss as a result of defendants alleged fraudulent conduct. Because this is a "fraud-on-the-market" case, the impact of defendants' fraud affected the entire market, although each holder will have its own damages. Class members are scattered throughout the United States, time frame is the proposed Class Period (October 12, 1999 through June 6, 2000) and the financial incentives are to recover the economic losses caused by defendants conduct.

4.      Questions of law and fact that are common to the Class:

(i)      Whether the defendants' acts as alleged herein violated the federal securities laws;

(ii)     Whether defendants participated in and pursued the common course of conduct complained of herein;

(iii)    Whether documents, SEC filings, press releases and other statements disseminated to the investing public and InterVoice's common stockholders during the Class Period misrepresented material facts about the operations, financial condition and earnings of InterVoice;

(iv)    Whether the market prices of InterVoice stock during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(v)    To what extent the members of the class have sustained damages and the proper measure of damages.

5.    In actions asserting a class under Fed. R. Civ. P. 23(b)(3), allegations concerning the findings required by that section:

The action should proceed as a class action because under Fed. R. Civ. P. 23(a)(1): (1) the Class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the Class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the Class; and (4) the representative parties will fairly and adequately protect the interests of the Class.  Under Fed. R. Civ. P. 23(b) the court finds that the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  This is covered in our brief.

(c)    The basis of the named plaintiff's claim to be an adequate representative of the Class, including financial responsibility to fund the action:

As set forth in the accompanying memorandum, the proposed class representatives are the lead plaintiffs and have a substantial interest in the relief sought. The lead plaintiff has been actively involved in this litigation and their claims are typical of the class members. As set forth more fully in the accompanying memorandum, they satisfy all of the requirements of Fed. R. Civ. P. 23. Lead counsel is advancing all expenses in connection with the litigation.

(d)    The basis for determining any required jurisdictional amount:

Not applicable.

(e)     The type and estimated expense of notice to be given to class members, and the source of funds from which notice costs will be paid:

Notice will be provided by first class mail and publication in a national business publication. Lead plaintiffs' counsel anticipate the approximate cost of this notice will be: $50,000. Lead plaintiffs' counsel will be advancing the costs of this notice.

(f)     The discovery necessary for a class certification hearing and the estimated time necessary for such discovery:

None. Estimated time for the hearing: one hour.

(g)     All arrangements for payment of plaintiffs' attorney's fees:

Lead plaintiffs' counsel have agreed to prosecute this action on a contingency fee basis. In the event of a resolution in favor of the lead plaintiffs, counsel will apply to the Court for a reasonable attorneys' fee.

DATED: February 3, 2006            LERACH COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                   JEFFREY W. LAWRENCE
                                   SHAWN A. WILLIAMS
                                   LESLEY E. WEAVER


                                   _____/S/ Jeffrey W. Lawrence_____
                                            JEFFREY W. LAWRENCE

                                   100 Pine Street, Suite 2600
                                   San Francisco, CA  94111
                                   Telephone:  415/288-4545
                                   415/288-4534 (fax)

                                   LERACH COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                   WILLIAM S. LERACH
                                   401 B Street, Suite 1600
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   Lead Counsel for Plaintiffs

STANLEY, MANDEL & IOLA, L.L.P.
MARC R. STANLEY
Texas State Bar No. 19046500
ROGER L. MANDEL
Texas State Bar No. 12891750
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  214/443-4300
214/443-0358 (fax)

Liaison Counsel

T:\CasesSF\InterVoice\BRF00027653.doc

<u>DECLARATION OF SERVICE BY FACSIMILE</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.     That on February 3, 2006, declarant served by facsimile the **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** to the parties listed on the attached Service List.

3.     That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of February, 2006, at San Francisco, California.

/s/ Rebecca Grounds
REBECCA GROUNDS

**Counsel For Defendant(s)**

William P. Hammer, Jr.
Ron  Hauben
Ernst & Young LLP
5 Times Square, 36th Floor
New York, NY  10036
   212/773-9177
   212/773-2333 (Fax)

Timothy R. McCormick
Richard B. Phillips, Jr.
Thompson & Knight, P.C.
1700 Pacific Avenue, Suite 3300
Dallas, TX  75201-4693
   214/969-1700
   214/969-1751 (Fax)

**Counsel For Plaintiff(s)**

William S. Lerach
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Jeffrey W. Lawrence
Shawn A. Williams
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
   415/288-4545
   415/288-4534 (Fax)

Marc R. Stanley
Roger L. Mandel
Stanley, Mandel & Iola, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
   214/443-4301
   214/443-0358 (Fax)