IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID BARRIE, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:01-CV-1071-K |
| | § | |
| INTERVOICE-BRITE, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Lead Plaintiffs' Motion for Class Certification, filed February 3, 2006, and Defendants' Request for Oral Argument on Plaintiffs' Motion for Class Certification, filed April 25, 2006. The court has considered the motion, response, reply, pleadings on file in this case, evidence submitted by the parties, and the applicable law. Because Lead Plaintiffs have carried their burden of establishing that class treatment of this case is appropriate under Fed. R. Civ. P. 23, the motion is **granted.** Defendants' Request for Oral Argument is **denied as moot.**

### I.    **Factual and Procedural Background**

Plaintiffs allege in their Consolidated Class Action Complaint ("Complaint"), InterVoice began operations in 1984, primarily marketing Interactive Voice Response Systems ("IVR") to financial institutions, universities, and government agencies. In April 1999, InterVoice agreed to acquire Brite for an aggregate purchase price of

1

$174.3 million in cash and stock.  Brite developed and sold IVR systems, and also developed Network Systems applications for telecommunications companies and provided automated call processing service and maintenance services to those customers.  Although InterVoice was also in the Network Systems business, Network Systems comprised approximately 30% of its business as compared to 70% for Brite. The newly merged company became InterVoice-Brite, Inc. ("IVB").  After the merger, IVB intended to sell products in two market segments: Business Systems, which included IVR systems products, and Network Systems, focusing on systems for telecommunications network customers.  The merger of InterVoice and Brite was completed in August 1999.

Plaintiffs contend that the merger was unsuccessful, but that Defendants concealed this reality and falsely maintained that the merger would continue to result in strong revenues and earnings, that former Brite customers were transitioning to InterVoice's NT IVR platform, that IVB had a strong backlog of orders and pipeline for new business, and that IVB was on track to report $0.76 and $1.25 earnings per share  in fiscal year 2000 and 2001, respectively.  Allegedly as a result of this rosy outlook, IVB's stock price rose from $11 per share in October 1999 to $38 per share in March 2000.

IVB issued a press release on June 6, 2000 wherein it stated that it had been impacted by sales staff attrition and was forecasting only $67-68 million (instead of

$89 million) in revenues for the fiscal year.  Analysts initially reduced their earnings per share estimates for IVB from $1.19 earnings per share to $0.60 earnings per share, but ultimately reduced projected earnings per share to $0.00.  On June 7, 2000, IVB's stock closed at $6.125 per share, down from a closing price of $13.5625 on the previous day, a loss of 55%.  Plaintiffs further state that on June 22, 2000, IVB announced it would take an $18 million before-tax charge to revenues for 4Q00 to account for software sales that were recognized at the time of shipment (instead of upon customer acceptance), contrary to Generally Accepted Accounting Principles ("GAAP") and American Institute of Certified Public Accountants Statement of Position ("SOP") 97-2.

Plaintiffs filed their Complaint for Violation of the Federal Securities Laws on June 5, 2001.  Plaintiffs allege that during the proposed Class Period of October 12, 1999 through June 6, 2000, Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), by misleading the public about the August 1999 merger, IVB's fourth quarter and fiscal year 2001 earnings and revenue projections, and its fiscal year 2000 year-end earnings and revenue results.

On September 5, 2001, the court appointed Plaintiffs Cary Alan Luskin and Debbie Luskin ("Lead Plaintiffs") as lead plaintiffs in this case, and approved their selection of lead counsel.  On August 8, 2002, the court dismissed Plaintiffs' consolidated class action complaint, granting leave to amend.  Plaintiffs filed their

First Amended Class Action Complaint on September 23, 2002. The court subsequently held that Plaintiffs had failed to plead their case in conformity with the pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and dismissed Plaintiffs' First Amended Complaint with prejudice on September 15, 2003.

Plaintiffs appealed the dismissal, and in May 2005 the United States Court of Appeals for the Fifth Circuit affirmed this court's decision in part, and reversed the dismissal of the following claims, which were remanded for further proceedings (the "Remanded Claims"):

1)      Plaintiffs' revenue recognition claim related to SOP 97-2;

2)      Plaintiffs' fraudulent earnings projections claims as follows:

   a.      the claim that Hammond made a false statement regarding financial goals;

   b.      the claims that Hammond or Graham made a false statement and the other failed to correct it; and

   c.      the claim that Smith failed to correct a statement made by Hammond or Graham.

Lead Plaintiffs now move for certification of a class action on behalf of persons who purchased the common stock of IVB between October 12, 1999 through and including June 6, 2000 (the "Class Period"). Lead Plaintiffs also seek the appointment of designated representatives and their counsel of record. Defendants oppose certification of the class.

4

## II.     Standards for Class Certification

Lead Plaintiffs bear the burden of showing that class certification is appropriate. *Unger v. Amedisys, Inc.,* 401 F.3d 316, 320 (5th Cir. 2005); *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir. 2001). Class certification is at the discretion of the district court, which has inherent power to manage and control pending litigation. *Vizena v. Union Pacific Railroad Co.,* 360 F.3d 496, 502-03 (5th Cir. 2004). The court's decision to grant class certification will only be reversed upon a showing of abuse of discretion, or that the court applied incorrect legal standards in reaching its decision. *Id.* at 502, *citing Berger,* 257 F.3d at 478.

A case may proceed as a class action only if the trial court determines that the party seeking certification demonstrates that all four requirements of Fed. R. Civ. P. 23(a) are met, and that at least one of the three requirements of Fed. R. Civ. P. 23(b) are met. *Id.* at 503, *citing Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). The party seeking certification bears the burden of proof. *Berger,* 257 F.3d at 479 n.4, *citing Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996). Although the court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts and applicable substantive law to make a meaningful decision on class certification. *Castano,* 84 F.3d at 744; *In re Electronic Data Systems Corp. Securities Litigation,* 226 F.R.D. 559, 565 (E.D. Tex.), *aff'd,* 429 F.3d 125 (5th Cir. 2005).

### III.     Rule 23 Analysis

To certify a class, the court must find that Plaintiffs have established that all of Fed. R. Civ. P. 23(a)'s requirements are met, and that at least one requirement of Fed. R. Civ. P. 23(b) is also met.  The court will examine each of the relevant factors below:

### A.     Rule 23(a) Requirements

Rule 23(a) requires that 1) the class be so numerous that joinder of all members is impracticable (numerosity); 2) there are questions of law or fact common to the class (commonality); 3) the claims or defenses of the representative parties be typical of the claims or defenses of the class (typicality); and 4) the representative parties fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P. 23(a).  Each requirement will be discussed separately as follows:

### 1.     Numerosity

The numerosity requirement is met if the plaintiff provides some evidence of a reasonable numerical estimate of purported class members.  *James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir. 2001), *cert. denied,* 534 U.S. 1113 (2002); *Pederson v. La. State Univ.,* 213 F.3d 858, 868 (5th Cir. 2000).  Lead Plaintiffs state that although they do not know the exact number of class members, as of May 2000 IVB had approximately 32 million shares outstanding, and that potential class members are scattered across the country.  Lead Plaintiffs have also presented evidence that during

6

the proposed Class Period, average reported daily trading volume for IVB stock was 644,000 shares.  Moreover, it is generally presumed that Rule 23(a)(1) has been met in suits involving nationally traded securities.  *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039 (5th Cir. 1981).  Defendants do not dispute Lead Plaintiffs' assertion that the numerosity requirement has been met.  The court finds the numerosity requirement to be satisfied in the instant case.

### 2.   Commonality

To show commonality, the plaintiff must allege that there exist "questions of law or fact common to the class."  *James,* 254 F.3d at 570; *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999).  The threshold for commonality is not high.  *Id., citing Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993). The plaintiff need only show that there is one common question of law or fact.  *James,* 254 F.3d at 570.  The interests and claims of each plaintiff need not be identical.  *Id.* The commonality test is met where there is at least one issue whose resolution will affect all or a significant number of the putative class members.  *Id., citing Forbush,* 994 F.2d at 1106.  Although some plaintiffs may have different claims, or claims calling for individualized analysis, this fact is not fatal to commonality.  *Id.*

Here, a review of Lead Plaintiffs' live pleading shows that the Remanded Claims are common to all of the possible class members, and Defendants do not dispute this contention.  Because Lead Plaintiffs have shown that there is at least one

7

common question of law or fact between all potential class members, the court finds that the Rule 23(a) commonality requirement is met here. *See James,* 254 F.3d at 570 (common legal theories of liability between plaintiffs met Rule 23(a) commonality standard); *Oscar Private Equity Investments v. Holland,* 2005 WL 877936, *6 (N.D. Tex. 2005) (same theory of recovery and material misrepresentations relied upon by plaintiffs was sufficient to establish commonality).

### 3.    Typicality

To meet the typicality requirement of Rule 23(a)(3), the claims or defenses of the parties must be typical of the claims or defenses of the class. *James,* 254 F.3d at 571; *Mullen,* 186 F.3d at 625.  This test focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *Id.; Mullen,* 186 F.3d at 625; *Forbush,* 994 F.2d at 1106.  The critical inquiry is whether the class representative's claims "have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id., citing* 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.24[4] (3d ed. 2000).

The Remanded Claims arise from a common course of conduct and each of the putative class members would bring claims based upon that alleged conduct under the same legal theories.  More specifically, Lead Plaintiffs and the potential class members

all invested in IVB stock during the proposed Class Period, and will all bring claims related to IVB's revenue recognition practices under SOP 97-2, and certain alleged fraudulent earnings projections based upon statements purportedly made by Defendants Hammond and/or Graham.   Moreover, Defendants do not contest Lead Plaintiffs' assertion that the typicality requirement has been met.   Accordingly, Lead Plaintiffs' claims are typical of those of the class, meeting the Rule 23(a)(3) standard.

### 4.    Adequacy

Under Rule 23(a)(4), the court must find that the "representative parties will fairly and adequately protect the interests of the class."   Fed. R. Civ. P. 23(a)(4); *James,* 254 F.3d at 571.   "Differences between the named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *James,* 254 F.3d at 571, *citing Mullen,* 186 F.3d at 625-26.   To satisfy the requirements of Rule 23(a)(4), Lead Plaintiffs must show that 1) there are no conflicts of interest between them and the class they seek to represent; 2) Lead Plaintiffs have the willingness and ability to play an active role in the litigation and vigorously represent the class, while protecting the interests of the absentee class members; and 3) that the class counsel has the competence and ability to vigorously conduct the litigation.   *Feder v. Electronic Data Systems Corp.,* 429 F.3d 125, 129-30 (5th Cir. 2005); *Berger,* 257 F.3d at 479-80.

In this case, Defendants do not dispute Lead Plaintiffs' contention that Lead Plaintiffs will fairly and adequately represent the interests of all class members. In support of their position, Lead Plaintiffs state that there are no conflicts of interest between them and the proposed class members. All class members (including Lead Plaintiffs) will bring claims based upon the same conduct and under the same legal theories, claiming that due to Defendants' alleged conduct, they purchased IVB stock at artificially inflated prices and suffered damages thereafter when IVB's stock price fell. Lead Plaintiffs further argue that they have already been vigorously prosecuting this case, and therefore meet the second Rule 23(a)(4) adequacy requirement. Finally, Lead Plaintiffs assert that their attorneys have considerable experience litigating securities fraud class actions, and have previously been appointed lead counsel in hundreds of securities class action cases, making the attorneys qualified to adequately litigate the claims of the class members before this court. The court agrees with the parties that Rule 23(a)(4)'s adequacy requirement has been met here.

**B.    Rule 23(b) Requirements**

Lead Plaintiffs contend that the class should be certified because, in addition to the requirements of Rule 23(a),they have also met the requirements of Rule 23(b)(3), which states that a class may be certified where common issues of law or fact "predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient

10

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3); *Unger,* 401 F.3d at 320.

These requirements are commonly known as "predominance" and "superiority."

### 1.    Predominance

Before granting class certification, the district court must determine that the

individual class members' fraud claims are not dependent upon proving individual

reliance.  *Unger,* 401 F.3d at 321.   As is stated above, the party seeking class

certification has the burden of proof.   *Berger,* 257 F.3d at 479 n.4.  If the

circumstances of each plaintiff's alleged reliance on fraudulent representations differ,

then each individual plaintiff will have to prove reliance and the proposed class does

not meet Fed. R. Civ. P. 23(b)(3)'s predominance requirement.  *Unger,* 401 F.3d at

321-22, *citing Castano,* 84 F.3d at 745.   However, a proposed class in a securities

fraud class action such as this case may establish predominance by availing itself of

the class-wide presumption of reliance permitted by the fraud-on-the-market theory

recognized in *Basic Inc. v. Levinson,* 485 U.S. 224(1988).  *Bell v. Ascendant Solutions,*

*Inc.,* 422 F.3d 307, 310 (5th Cir. 2005).

The fraud-on-the-market theory permits investors who cannot satisfy the

traditional requirement of proving actual reliance on a fraudulent representation (i.e.,

those investors who did not read the documents or hear the statements alleged to

contain the fraudulent representations) to maintain their fraud claims by

'"interpreting the reliance requirement to mean reliance on the integrity of the market

11

price rather than reliance on the challenged disclosure."' *Id.* at 422 F.3d at 310 n.2, *quoting* Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L. Rev. 907, 908 (1989).   To rely on the fraud-on-the-market presumption, the plaintiffs must show that 1) the defendant made public material misrepresentations; 2) the defendant's shares were traded in an efficient market; and 3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed.  *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 661 (5th Cir. 2004), *citing Basic,* 485 U.S. at 248 n.27.   When considering class certification based upon a fraud-on-the-market theory, the court "must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence."  *Bell,* 422 F.3d at 313 n.11, *citing Unger,* 401 F.3d at 325.

### a.   First and Third Factors – Trading Shares and Material Misrepresentations

Here it is undisputed that Lead Plaintiffs traded shares of IVB between the time of the alleged misrepresentations and the June 6, 2000 announcement of decreased earnings per share.   Although Defendants dispute whether material misrepresentations were made, this dispute goes to the merits of the case, rather than to whether the case can be certified as a class action.  *See Castano,* 84 F.3d at 744 (at class certification stage, court does not reach the merits of the case); *Lehocky v. Tidel Technologies, Inc.,* 220 F.R.D. 491, 505 n.16 (S.D. Tex. 2004) (same).   Therefore, at

this stage the court determines based upon the evidence and the pleadings that to the extent necessary for class certification purposes, the third prong of the fraud-on-the-market theory has been satisfied.

### b. Second Factor – Efficient Market

The fraud-on-the-market theory assumes that in an efficient market, the market price of a stock reflects all public information, so that an investor who purchases a stock in such a market is harmed if the price of that stock reflects false information as a consequence of a material misrepresentation. *Bell,* 422 F.3d at 310 n.2. In such a market, misleading information will presumably defraud investors even if those purchasers have not directly relied on the misstatements. *Unger,* 401 F.3d at 322, *citing Basic,* 485 U.S. at 241-42. Therefore, to take advantage of this presumption of reliance, a securities fraud plaintiff must show that the stock at issue is traded in an "efficient market." *Unger,* 401 F.3d at 322.

Courts examine the following factors in making a determination of market efficiency: 1) the average weekly trading volume expressed as a percentage of outstanding shares; 2) the number of securities analysts following and reporting on the stock; 3) the extent to which market makers and arbitrageurs trade in the stock; 4) the company's eligibility to file SEC registration Form S-3 (as opposed for Form S-1 or S-2); 5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response

in the stock price"; 6) the company's market capitalization; 7) the bid-ask spread for stock sales; and 8) float, the stock's trading volume without counting insider-owned stock. *Bell,* 422 F.3d at 313 n.9; *Unger,* 401 F.3d at 323, *both citing Cammer v. Bloom,* 711 F. Supp. 1264, 1286-87 (D. N.J. 1989).   These factors must be "weighed analytically" by the district court, because they each represent a different facet of market efficiency. *Unger,* 401 F.3d at 323.

### i.      Average Trading Volume

A large weekly volume of stock trades suggests significant investor interest in a company, and implies that many investors are executing trades on the basis of newly available or disseminated corporate information. *Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Cammer,* 711 F. Supp. at 1286; *see also Unger,* 401 F.3d at 324 (a high weekly stock trading volume suggests the presence of active, informed investors).   Average trading volume is one of the strongest factors in gauging the efficiency of the market. *Krogman,* 202 F.R.D. at 474, *citing Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1122 (5th Cir. 1988), and  *Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 360 n.8 (5th Cir. 1987).  Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption. *Id., citing Cammer,* 711 F. Supp. At 1286.   Here, Lead Plaintiffs have shown that IVB stock traded at an average weekly volume of over three million shares

during the proposed Class Period.  This trading volume represented over 9% of IVB's outstanding shares, which is greatly in excess of the 1-2% minimum trading volume courts have found to support a finding of market efficiency.   Defendants do not dispute this figure.  Because IVB stock was actively traded during the Class Period, this evidence weighs in favor of a finding of market efficiency.

### ii.    Reporting on Stock by Securities Analysts

The number of securities analysts who review and report on a company's stock can increase the likelihood that information disseminated by the corporation is relied upon by the stock trading public. *Krogman,* 202 F.R.D. at 475; *Cammer,* 711 F. Supp. at 1286.  A showing that a substantial number of analysts followed the stock shows that it was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based upon information publicly available about the company.  *Krogman,* 202 F.R.D. at 475; *see also Lehocky,* 220 F.R.D. at 508 (greater number of securities analysts covering a security makes it more likely that investors have relied on disseminated information).  In this case, Lead Plaintiffs point to evidence showing that during the Class Period, twelve different securities analysts covered and reported on IVB stock, including several well-known brokerage firms. Defendants do not dispute this proof of analyst coverage or argue that the number of analysts cited by Lead Plaintiffs is insufficient to establish a finding of market efficiency.  Based upon this information, the court finds that this factor also supports

a finding that IVB stock traded in an efficient market.

### iii.    Market Maker Activity

Although the number of market makers as an indicator of market efficiency has been strongly criticized (and is given little weight) by the courts, this factor still may be considered in conjunction with their volume of trading activity. *Unger,* 401 F.3d at 324; *Krogman,* 202 F.R.D. at 476.   A market maker is a firm that makes a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at these publicly-quoted prices. *Lehocky,* 220 F.R.D. at 508 n.24.   Market makers are generally large brokerage houses that trade in a specific number of shares at a specific price. *Griffin v. GK Intelligent Sys., Inc.,* 196 F.R.D. 298, 303 (S.D. Tex. 2000), *citing O'Neil v. Appel,* 165 F.R.D. 479, 501 (W.D. Mich. 1996).   However, the mere presence of market makers does not indicate market efficiency. *Krogman,* 202 F.R.D. at 476, *citing O'Neil,* 165 F.R.D. at 501-02.   What is important is "'the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so.'" *Id., quoting O'Neil,* 165 F.R.D. at 502. Evidence of the number of market makers alone has limited probative value for purposes of determining market efficiency. *Griffin,* 196 F.R.D. at 304.

Lead Plaintiffs assert that during 1999 and 2000, over 225 firms acted as market makers in IVB stock.  Their expert's report further shows that many of those market makers traded IVB stock in high volumes.  Therefore, the court finds that this

16

market maker activity also weighs in favor of finding that IVB's stock traded in an efficient market.

### iv.     Eligibility to File Form S-3

Form S-3 is a short form for the registration of securities that a company may use if certain registrant and transaction requirements are met.  17 C.F.R. § 239.13.  A company that has filed monthly reports with the SEC for one year and has common equity held by non-affiliates of the registrant in excess of $75 million is eligible to file Form S-3.  *Id.; Oscar,* 2005 WL 877936 at *10.  Only corporations whose stocks are actively traded and widely followed are allowed by the SEC to file Form S-3. *O'Neil,* 165 F.R.D. at 502; *Krogman,* 202 F.R.D. at 476.  Courts have recognized eligibility for filing of an S-3 Registration Statement as a factor indicating market efficiency, reasoning that the SEC permits companies to file an S-3 upon the premise that the stock is traded in an open and efficient market, such that further disclosure is unnecessary.  *Krogman,* 202 F.R.D. at 476, *citing O'Neil,* 165 F.R.D. at 502, and *Cammer,* 711 F.Supp. at 1287.  Lead Plaintiffs have shown that IVB was eligible to file Form S-3 during the entire Class Period.  Defendants do not dispute this information.  Accordingly, IVB's eligibility to file an S-3 Registration Statement weighs in favor of a finding of market efficiency.

### v.     Reaction of the Stock Price to New Material Information

Evidence of a causal relationship between unexpected corporate events or

financial releases and an immediate response in the price of the stock is an important indicator of market efficiency. *Id.* At 477; *Cammer,* 711 F. Supp. at 1287. Some courts have stated that this factor is paramount to the others in a determination of market efficiency. *See Unger,* 401 F.3d at 324 (causal connection between stock price and corporate events goes to the heart of the fraud-on-the-market theory); *Cammer,* 711 F. Supp. at 1287 (this factor is "the essence of an efficient market and the foundation for the fraud on the market theory"); *In re 2TheMart.com, Inc.,* 114 F. Supp.2d 955, 964 (C.D. Cal. 2000) (fifth *Cammer* factor may be most important to evaluation of market efficiency). In an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly when the market receives new and unexpected information. *Unger,* 401 F.3d at 324; *Krogman,* 202 F.R.D. at 477. However, many variables could potentially impact share price, such as the daily market average, national, local, and industry-specific economic news, and competitors' activities. *Unger,* 401 F.3d at 325. Facts showing a rapid change in share price after positive or negative company news  are "no doubt worthwhile, but standing alone [are] insufficiently probative to determine" that a causal connection exists. *Id.*

Through their expert report, Lead Plaintiffs have shown that after IVB reported on June 6, 2000 that it would report a loss of $0.03 to $0.05 per share for the quarter ended May 31, 2000, IVB's stock declined almost 55% by the close of the market the

18

following day.  Based on this evidence, Lead Plaintiffs assert that the quick response in the stock price (a 55% price drop in one day) to this material disclosure supports a finding of market efficiency.  Defendants argue that this proof is insufficient because Lead Plaintiffs' expert provides no independent statistical analysis, does not compare the market reaction following the above press release to the market reaction following other announcements by IVB, and does not consider whether other events or information could have impacted the stock price.

The court agrees that Lead Plaintiffs' expert could have more thoroughly analyzed this factor.  By limiting his analysis to only one announcement and corresponding reaction in the stock price, the expert failed to consider the other factors identified by the Fifth Circuit as potentially impacting share price, such as the daily market average, national, local and industry-specific economic news, and competitor's activities.  *Unger,* 401 F.3d at 325.  While the June 6 announcement and subsequent June 7 price drop are certainly supportive of a finding that the market was efficient, the expert analysis provided by Lead Plaintiffs is simply too conclusory.  Thus, the prompt drop in the stock price on June 7 cannot alone be a conclusive indicator of market efficiency.  While this evidence weighs slightly toward a finding of market efficiency, it can only be considered for its contribution to the overall weighing of the eight relevant factors, and in this case cannot be considered as "paramount" proof of an efficient market.

19

### vi.      Market Capitalization

Market capitalization is another indicator of market efficiency.  *Unger,* 401 F.3d at 325 n.7; *Krogman,* 202 F.R.D. at 478.  Market capitalization is calculated as the number of shares multiplied by the prevailing share price, and may indicate market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.  *Krogman,* 202 F.R.D. at 478, *citing O'Neil,* 165 F.R.D. at 503.  Investors are more confident investing in corporations with large market capitalizations because "large firm size and dollar trading volume tend to reflect the magnitude of economic incentive to eliminate mispricing."  *O'Neil,* 165 F.R.D. at 503.  Lead Plaintiffs state that during the Class Period, IVB had a large market capitalization ranging from $300 million to $1.2 billion.  Defendants do not contest these figures.  The court agrees with Lead Plaintiffs that IVB's large market capitalization weighs in favor of a finding that IVB stock was traded in an efficient market.

### vii.      Bid-Ask Spread

The court should also consider the bid-ask spread for the stock at issue when determining whether it traded in an efficient market.  *Unger,* 401 F.3d at 325 n.7.  The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to buy their shares.  *Krogman,* 202 F.R.D. at 478.  A large bid-ask spread suggests inefficiency,

because the stock is too expensive to trade. *Id.* Lead Plaintiffs' expert has calculated the bid-ask spread for IVB stock at 0.5% of the price, which he describes as a low bid-ask spread. The court agrees that this proof supports the conclusion that the market for IVB stock was efficient.

### viii.   Float

Float is the percentage of a corporation's shares that are held by the public as opposed to insiders. *Id.* At 478; *O'Neil,* 165 F.R.D. at 503. Prices of stocks that have greater holdings by insiders as opposed to the public are less likely to reflect all available information about the security. *Id.* Lead Plaintiffs have provided evidence showing that the market value of public float for IVB stock ranged from $275 million to $1.1 billion. Defendants do not dispute the facts showing that IVB had a large float. Therefore, the court finds that IVB's large public float weighs in favor of a finding of market efficiency.

### c.      Summary of the Predominance Factors

To summarize, Lead Plaintiffs have shown that during the Class Period:

- IVB stock had a high weekly trading volume;

- at least twelve securities analysts followed and reported on the stock;

- there were numerous market makers in the stock who traded in large quantities;

- IVB was eligible to file SEC Form S-3 throughout the Class Period; and

- that IVB had a low bid-ask spread, a large market capitalization, and a

large public float.

Lead Plaintiffs have further shown that the price of IVB stock declined sharply immediately following an announcement that the company's earnings per share would be far below expectations, although (as discussed above) this evidence is not as compelling as it might have been.   However, the fact that this proof is somewhat lacking does not doom Lead Plaintiffs' attempt to establish the presumption, because of the overall collective strength of the other relevant factors.   Finally, Lead Plaintiffs have set forth proof that After weighing all of these factors, the court concludes that Lead Plaintiffs have shown the market to be efficient, and that the first and third elements of the fraud-on-the-market theory have also been met.   Thus, they are entitled to the fraud-on-the-market presumption in this case.

### d.   Rebuttal   of   the   Fraud-on-the-Market Presumption

Where plaintiffs have established the fraud-on-the-market presumption, the presumption may be rebutted by showing that the stock price was unaffected by fraud, or that the plaintiff would have made the purchase regardless of the undisclosed information.  *Krogman,* 202 F.R.D. at 473; *see also Greenberg,* 364 F.3d at 661-62 (presumption can be rebutted by proof that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price).   Defendants contend that even if the fraud-on-the-market presumption is applied, they have rebutted this presumption and

therefore the class cannot be certified because the predominance requirement has not been met.   Although *Basic* and *Greenberg* (the cases relied upon by Defendants) both held the presumption to be rebuttable at the summary judgment stage, such a finding by the court here, where the issue is class certification, would be premature, since the court cannot delve into the actual merits of Lead Plaintiffs' claims.  *Castano,* 84 F.3d at 744; *Lehocky,* 220 F.R.D.  at 505 n.16.  *See also Oscar,* 2005 WL 877936 at *12 n.16 (that defendants retain a right of rebuttal does not preclude a finding of predominance of common questions of fact or law).  Therefore, although Defendants may ultimately succeed in rebutting the fraud-on-the-market presumption on the merits, that question need not be reached here today.

### e.    Loss Causation Issues

Finally, Defendants attempt to avert class certification by arguing that Lead Plaintiffs have not shown that common issues of loss causation predominate. Defendants argue that under *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005), Plaintiffs must demonstrate a "cause-and-effect chronology" and that this "chronology" is the only way to establish common issues of loss causation. (Defendants' Brief at p. 16).  They further assert that under *Dura,* a party seeking class certification must show a misrepresentation, followed by an increase in the stock price, followed by a revelatory statement, followed finally by a drop in the price of the stock.  (*Id.*).  Thus, they contend that because the June 6, 2000 announcement did

23

not specifically refer to IVB's revenue-recognition practices, the June 7, 2000 drop in stock price cannot be causally linked to the acts of accounting fraud alleged by Lead Plaintiffs.

The court has reviewed the *Dura* opinion, and disagrees that it precludes class certification here. The court initially notes that *Dura* was not decided on a motion for class certification, but rather on a motion to dismiss. 544 U.S. at 340. In that case, the Court reversed a lower court ruling that a purchaser's loss is incurred at the time shares are purchased at an artificially high price, rather than after that price drops and the purchaser sells the shares at a lower price. *Id.* at 346. In a short opinion, the Court reinforced the PSLRA's requirement that plaintiffs have the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover. *Id.* at 345-46, *citing* 15 U.S.C. § 78u-4(b)(4). Therefore, the Court held that party seeking recovery in a PSLRA case must prove that a misrepresentation proximately caused economic loss, and that the mere purchase of an overpriced stock does not satisfy the statutory loss causation requirement. *Id.* at 346. *Dura* does not establish a specific "cause-and-effect chronology" or other framework for parties seeking to show that common issues predominate for class certification purposes. Although Defendants may ultimately prevail by overcoming Lead Plaintiffs' assertion of proximate loss causation on the merits, those issues (like the rebuttal of the fraud-on-the-market presumption) are not

reached by the court at the class certification stage.

## 2.    Superiority

Class actions are considered superior when individual actions would be wasteful, duplicative, present managerial difficulty and be adverse to judicial economy. *Mullen,* 186 F.3d at 627. The court also considers whether class treatment of a case will "'achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.'" *Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 570 (S.D. Tex. 2000), *quoting State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 315 (5th Cir. 1978).

The four factors to be considered with respect to the superiority requirement are found in Fed. R. Civ. P. 23(b)(3)(A)-(D). They are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D); *Robinson v. Texas Automobile Dealers Assn.,* 387 F.3d 416, 425 (5th Cir. 2004), *cert. denied,* 544 U.S. 949 (2005). Additionally, in considering the superiority requirement, the district court must possess an understanding of the

relevant claims, defenses, factual and legal issues, and how the case will be tried. *Feder,* 429 F.3d at 139; *Robinson,* 387 F.3d at 425.

Here, the identity of the factual and legal issues between all proposed class members makes the notion that they should be required to file hundreds or thousands of individual lawsuits illogical, and forcing them to do so would encourage a waste of judicial and private resources. All class members' claims arise from the same course of conduct and are based upon the same legal theories. Resolution of these claims will affect each class member similarly, and it would be economically prohibitive for many class members who suffered smaller losses to prosecute individual actions. *See Amchem,* 521 U.S. at 617 (policy behind the class mechanism overcomes problem that small recoveries inhibit individuals from bringing solo actions to prosecute their rights). Therefore, the first of the four superiority factors – lack of interest of each individual plaintiff in controlling the litigation – favors maintenance of a class action here.

The court also views the second factor – the extent and nature of any litigation already commenced by class members – as supportive of a finding that class treatment is appropriate here. The court is unaware of any other litigation related to this controversy and involving the same proposed class members, and neither party has submitted any facts showing that such parallel litigation exists. The instant litigation has been ongoing for several years, and is well-developed. Given the stage that this

litigation has reached, the court also finds that (under the third superiority factor) it is desirable to concentrate and continue the litigation in this forum.  By avoiding fragmentation of this case into other courts and jurisdictions, class certification will increase efficiency, decrease costs for both the proposed class and Defendants, and avert the possibility of inconsistent results.

Finally, the court does not anticipate any particular difficulties in managing this case as a class action that would disfavor such treatment.  All class members bring federal securities fraud claims and present no individually novel legal issues.  The court anticipates that at trial, the major issue will be the class's ability to establish causation with respect to their alleged losses.  The potential size of the class appears to be large enough for class certification.  Moreover, Defendants do not contest Lead Plaintiffs assertion that the Rule 23(b) superiority requirement has been met in this case.  For all of these reasons, the court determines that a class action is the superior method for adjudication of this controversy.  *See Lehocky,* 220 F.R.D. at 511 (finding that superiority requirement was met in securities fraud case); *Longden v. Sunderman,* 123 F.R.D. 547, 558-59 (N.D. Tex. 1988) (same).

## IV.    Definition of the Class

An order certifying a class action must define the class and the class claims, issues or defenses.  Fed. R. Civ. P. 23(c)((1)(B); *In re Electronic Data Sys. Corp. "ERISA" Litigation,* 224 F.R.D. 613, 631 (E.D. Tex. 2004).  A precise class definition

27

is necessary to properly identify those entitled to relief, those bound by the judgment, and those entitled to notice.  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir.), *cert. denied,* 543 U.S. 870 (2004).  Here, the class is easily defined as persons who purchased the common stock of IVB between October 12, 1999 through and including June 6, 2000, and the class issues are the same as those described above as the Remanded Claims:

1)    Plaintiffs' revenue recognition claim related to SOP 97-2;

2)    Plaintiffs' fraudulent earnings projections claims as follows:

a.    the claim that Hammond made a false statement regarding financial goals;

b.    the claims that Hammond or Graham made a false statement and the other failed to correct it; and

c.    the claim that Smith failed to correct a statement made by Hammond or Graham.

## V.    Appointment of Class Representatives and Counsel

In addition to certification of the class, Lead Plaintiffs Debbie Luskin and Cary Alan Luskin (the "Luskins") move the court for their appointment as class representatives, and for the appointment of the firm of Lerach Coughlin as class counsel and Stanley, Mandel and Iola, L.L.P. as liaison counsel.  Because the court has decided to certify the class, it must consider whether Lead Plaintiffs will be appropriate class representatives, and whether their lawyers should be appointed as

class counsel and liaison counsel, respectively.

## A. Appointment of Class Representatives

To determine whether the Luskins are appropriate representatives for the class, the court must examine whether they are willing and able to take an active role in and control the litigation and to protect the interests of the absentees. 15 U.S.C. § 78u-4(a)(3)(B); *Berger,* 257 F.3d at 479, *clarified in* 279 F.3d 313 (5th Cir. 2002). The record in this case shows that the Luskins collectively purchased almost 8,000 shares of IVB stock during the Class Period, and have been prosecuting this case on behalf of the putative class for several years, including participating in discovery and working with their counsel to defend against a motion to dismiss. They state that they have actively monitored the litigation and will continue to keep abreast of developments in the case. Defendants do not oppose the appointment of the Luskins as class representatives. The court finds that thus far the Luskins have shown themselves to be appropriate class representatives, and **grants** their motion for appointment as class representatives.

## B. Appointment of Class Counsel

Under Fed. R. Civ. P. 23(g)(1)(A), a court that certifies a class must appoint class counsel. Here, the law firms of Lerach Coughlin and Stanley, Mandel and Iola, L.L.P. seek appointment as class counsel and liaison counsel, respectively. The court should not disturb the lead plaintiff's choice of counsel unless it is necessary to

protect the interests of the class. *In re Enron Corp. Securities Litigation,* 206 F.R.D.

427, 441 (S.D. Tex. 2002). However, even in the absence of opposition, the party

seeking appointment of class counsel bears the burden of affirmatively proving that

counsel is competent and qualified to represent the class. *Berger,* 257 F.3d at 480-81;

*Enron,* 206 F.R.D. at 441.

In appointing class counsel, the court must consider the work counsel has done

in identifying or investigating potential claims in the action, counsel's experience in

handling class actions, other complex litigation, and claims of the type asserted in the

action, counsel's knowledge of the applicable law, and the resources counsel will

commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C). Here, the Lerach and

Stanley firms are the only firms requesting appointment as counsel for the class. The

court has reviewed the evidence submitted by Lead Plaintiffs in support of their

motion to appoint the two firms. Both firms have extensive experience litigating

claims such as those brought in this case, and the court is satisfied that the Lerach

and Stanley firms both meet the criteria established in Rule 23(g). Due to his prior

appearances before this court (in both state and federal court), the court is especially

well-acquainted with Marc Stanley's ability to provide quality representation in this

type of case. Further, the court notes that the Lerach and Stanley firms are Lead

Plaintiffs' choice of counsel, and that Defendants have asserted no opposition to the

appointment of these firms to represent the class. Accordingly, Lead Plaintiffs'

motion to appoint the Lerach and Stanley firms as class counsel and liaison counsel is **granted**.

## VI.    Conclusion

For the foregoing reasons, Lead Plaintiffs' Motion for Class Certification is **granted,** and Defendants' Request for Oral Argument is **denied as moot.**   The following class is hereby certified:

All persons, without geographic limitation, who purchased Intervoice-Brite, Inc. common stock during the period from October 12, 1999 through and including June 6, 2000, and who were damaged by Defendants' alleged violations of sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934.   Excluded from the class are Defendants, their legal representatives, heirs, successors and predecessors in interest, affiliates, assigns, and any entities in which the Defendants (or any of them) had a controlling interest in during the Class Period.

**SO ORDERED.**

Signed September 25th, 2006.

_Ed Kinkeade_
_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE