IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DAVID BARRIE, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:01-CV-1071-K |
| | § | |
| INTERVOICE-BRITE, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Lead Plaintiffs' Motion for Class Certification, filed February 3, 2006, and the parties' various supplemental filings regarding the class certification issue, which were filed between October 2007 and September 2009. The court has considered the motion, response, reply, additional pleadings on file in this case, evidence submitted by the parties, and the applicable law. Because Lead Plaintiffs are now required, under *Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* 487 F.3d 261 (5th Cir. 2007), and *Alaska Electrical Pension Fund v. Flowserve Corp.,* 572 F.3d 221 (5th Cir. 2009) to set forth sufficient evidence that common issues of loss causation predominate in order to meet the requirements set forth in Fed. R. Civ. P. 23(b)(3), the court must find that Lead Plaintiffs have not carried their burden of establishing that class treatment of this case is appropriate. Accordingly, Lead Plaintiffs' Motion for Class Certification is **denied.**

1

I.      **Factual and Procedural Background**

Plaintiffs allege in their Consolidated Class Action Complaint ("Complaint"), InterVoice began operations in 1984, primarily marketing Interactive Voice Response Systems ("IVR") to financial institutions, universities, and government agencies. In April 1999, InterVoice agreed to acquire Brite for an aggregate purchase price of $174.3 million in cash and stock. Brite developed and sold IVR systems, and also developed Network Systems applications for telecommunications companies and provided automated call processing service and maintenance services to those customers. Although InterVoice was also in the Network Systems business, Network Systems comprised approximately 30% of its business as compared to 70% for Brite. The newly merged company became InterVoice-Brite, Inc. ("IVB"). After the merger, IVB intended to sell products in two market segments: Business Systems, which included IVR systems products, and Network Systems, focusing on systems for telecommunications network customers. The merger of InterVoice and Brite was completed in August 1999.

Plaintiffs contend that the merger was unsuccessful, but that Defendants concealed this reality and falsely maintained that the merger would continue to result in strong revenues and earnings, that former Brite customers were transitioning to InterVoice's NT IVR platform, that IVB had a strong backlog of orders and pipeline for new business, and that IVB was on track to report $0.76 and $1.25 earnings per

2

share  in fiscal year 2000 and 2001, respectively.  Allegedly as a result of this rosy outlook, IVB's stock price rose from $11 per share in October 1999 to $38 per share in March 2000.

IVB issued a press release on June 6, 2000 wherein it stated that it had been impacted by sales staff attrition and was forecasting only $67-68 million (instead of $89 million) in revenues for the first fiscal quarter of 2001.  Analysts initially reduced their earnings per share estimates for IVB from $1.19 earnings per share to $0.60 earnings per share, but ultimately reduced projected earnings per share to $0.00.  On June 7, 2000, IVB's stock closed at $6.125 per share, down from a closing price of $13.5625 on the previous day, a loss of 55%.

Plaintiffs further state that on June 22, 2000, IVB announced it would take an $18 million before-tax charge to revenues for 4Q00 to account for software sales that were recognized at the time of shipment (instead of upon customer acceptance), contrary to Generally Accepted Accounting Principles ("GAAP") and American Institute of Certified Public Accountants Statement of Position ("SOP") 97-2.  This change in revenue recognition practices was made by implementing the Securities and Exchange Commission's Staff Accounting Bulletin No. 101 ("SAB 101"), as stated in the June 22 press release.  There was no change in IVB's stock price following this announcement.  On July 11, 2000, IVB announced its 1Q01 results in a press release, explaining that the implementation of SAB 101 had caused an $11.3 million charge

3

in that quarter.    IVB's stock price then climbed 3% following the July 11 announcement.

Plaintiffs filed their Complaint for Violation of the Federal Securities Laws on June 5, 2001.  Plaintiffs allege that during the proposed Class Period of October 12, 1999 through June 6, 2000, Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), by misleading the public about the August 1999 merger, IVB's fourth quarter and fiscal year 2001 earnings and revenue projections, and its fiscal year 2000 year-end earnings and revenue results.

On September 5, 2001, the court appointed Plaintiffs Cary Alan Luskin and Debbie Luskin ("Lead Plaintiffs") as lead plaintiffs in this case, and approved their selection of lead counsel.   On August 8, 2002, the court dismissed Plaintiffs' consolidated class action complaint, granting leave to amend.   Plaintiffs filed their First Amended Class Action Complaint on September 23, 2002.   The court subsequently held that Plaintiffs had failed to plead their case in conformity with the pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and  dismissed Plaintiffs' First Amended Complaint with prejudice on September 15, 2003.

Plaintiffs appealed the dismissal, and in May 2005 the United States Court of Appeals for the Fifth Circuit affirmed this court's decision in part, and reversed the

dismissal of the following claims, which were remanded for further proceedings (the "Remanded Claims"):

1) Plaintiffs' revenue recognition claim related to SOP 97-2/SAB 101;

2) Plaintiffs' fraudulent earnings projections claims as follows:

    a. the claim that Hammond made a false statement regarding financial goals;

    b. the claims that Hammond or Graham made a false statement and the other failed to correct it; and

    c. the claim that Smith failed to correct a statement made by Hammond or Graham.

Lead Plaintiffs moved for certification of a class action on behalf of persons who purchased the common stock of IVB between October 12, 1999 through and including June 6, 2000 (the "Class Period"). The court granted class certification in its Memorandum and Opinion and Order entered September 26, 2006, and also appointed Lead Plaintiffs and class counsel.

Defendants did not contest much of Lead Plaintiffs' class certification arguments and evidence. Their primary argument in opposition to Lead Plaintiffs' motion was that Lead Plaintiffs had failed to show that their alleged misstatements were related to the information contained in the June 6, 2000 press release. Defendants therefore asserted that because Lead Plaintiffs could not show "loss causation," they could not show that class-wide (versus individual) issues of reliance predominate, which under Fed. R. Civ. P. 23(b)(3) is needed to successfully establish

that class treatment of the case was warranted.  The court disagreed with Defendants, holding that issues of loss causation were more appropriately reserved for the merits stage of this litigation, thus finding that a class could be certified without Lead Plaintiffs making such a showing.

Defendants appealed this court's September 2006 class certification order in November 2006, asserting that the class should not have been certified because this court did not require Lead Plaintiffs to show that the alleged misrepresentations artificially moved IVB's stock price upward, and that a later related corrective statement caused the stock price to drop.  Defendants also complained on appeal that the class certified should not have included individuals who did not sell their stock prior to September 5, 2000, the date that the stock price recovered to its pre-June 7, 2000 level.

Approximately eight months later, the Fifth Circuit issued its opinion in *Oscar,* noting widespread confusion as to whether loss causation is appropriately determined at the class certification stage.  487 F.3d at 266.  To clarify, the Fifth Circuit noted that under *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657 (5th Cir. 2004), and *Unger v. Amedisys, Inc.,* 401 F.3d 316 (5th Cir. 2005)*,* "loss causation is a fraud-on-the-market prerequisite" requiring the district court to "find" the facts favoring class certification. *Oscar,* 487 F.3d at 268-69.  That court went on to hold that loss causation must therefore be established at the class certification phase, "by a preponderance of all

admissible evidence." *Id.* at 269.  In other words, to avail themselves of a class-wide presumption of reliance, and qualify for class certification, Lead Plaintiffs must show that Defendants' alleged misrepresentations caused their economic loss.  *Id.* at 271. As was expected following *Oscar,* the Fifth Circuit determined on appeal that in the instant case, Lead Plaintiffs had not established loss causation by a preponderance of the evidence, and thus remanded the case to this court in February 2008 for reconsideration and further analysis of that issue.

At this juncture, the court notes its agreement with Defendants as to whether the class definition it previously adopted was overly broad.  Those individuals who held their stock until after September 5, 2000 did not incur the requisite economic loss, as IVB's stock price had by then recovered to its pre-June 7, 2000 level. However, at this point such a finding is *dicta,* as the court will not certify the class for the reasons set forth below.

Because the bulk of the court's prior order certifying the class was not appealed, the parties will note that this opinion incorporates much of the court's prior analysis regarding the various aspects of class certification.  These portions of the opinion now constitute the law of the case.  *See, e.g., Jackson v. FIE Corp.,* 302 F.3d 515, 521 n.6 (5th Cir. 2002) (ruling not challenged in prior appeal became law of the case); *United States v. Reyna,* 2008 WL 5272507, **2 (5th Cir. 2008) (in subsequent appeal, law of case doctrine precluded consideration of issue not raised in earlier

7

appeal).  However, in the aftermath of *Oscar* and *Flowserve,* the court now re-examines whether it can certify the class in view of the requirement that loss causation be established by a preponderance of the evidence at the class certification stage, in order to establish that class-wide issues will predominate over individual issues of reliance.  For the reasons stated herein, it cannot.

## II.      Summary of Lead Plaintiffs' Live Claims

As the court has previously noted, very few of Lead Plaintiffs' fraud claims remain.  Briefly stated, the factual bases for these alleged false statements are as follows:

### A.      12/16/99 Conference Call (Complaint ¶ 41)

Lead Plaintiffs allege that during a conference call with investors, Hammond and/or Graham stated that the merger was "progressing nicely", and that IVB was on track to report EPS of $0.76 for FY00 and $1.25 for FY01.  Lead Plaintiffs have not shown that there was a statistically significant increase in IVB's share price following these purported statements.

### B.      4/12/00 Conference Call (Complaint ¶¶ 61-62)

In their Complaint, Lead Plaintiffs assert that during a conference call on April 12, 2000, Hammond and Graham falsely stated that "the outlook for Business Systems was improving", and that IVB "remained on track to report FY01 EPS of $1.26.  Again, there is no proof of a statistically significant increase in IVB's stock

price after these comments were allegedly made.

### C. 5/00 Road Show Statements (Complaint ¶ 71)

Lead Plaintiffs contend that during a road show for institutional investors, Hammond and Graham made statements "promoting the sales pipeline" and reporting that the "merger was going well." Like the alleged false statements of December 1999 and April 2000, again there was no statistically significant increase in the price of IVB's stock following these alleged road show statements.

### D. Revenue Recognition Practices (Complaint ¶¶ 89-91)

According to Lead Plaintiffs, Defendants falsely reported IVB's financial results for the quarters ending August 31, 1999 and November 30, 1999, and the fiscal year ended February 29, 2000. This purported false financial reporting was due to IVB's recognition of sales revenue upon shipment of its software, rather than recognition following installation and customer acceptance.

### III. Standards for Class Certification

Lead Plaintiffs bear the burden of showing that class certification is appropriate. *Unger,* 401 F.3d at 320; *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir. 2001). Class certification is at the discretion of the district court, which has inherent power to manage and control pending litigation. *Vizena v. Union Pacific Railroad Co.,* 360 F.3d 496, 502-03 (5th Cir. 2004). The court's decision to grant class certification will only be reversed upon a showing of abuse of discretion, or that

the court applied incorrect legal standards in reaching its decision. *Id.* at 502, *citing Berger,* 257 F.3d at 478.

A case may proceed as a class action only if the trial court determines that the party seeking certification demonstrates that all four requirements of Fed. R. Civ. P. 23(a) are met, and that at least one of the three requirements of Fed. R. Civ. P. 23(b) are met. *Id.* at 503, *citing Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). The party seeking certification bears the burden of proof. *Berger,* 257 F.3d at 479 n.4, *citing Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996). Although the court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts and applicable substantive law to make a meaningful decision on class certification. *Castano,* 84 F.3d at 744; *In re Electronic Data Systems Corp. Securities Litigation,* 226 F.R.D. 559, 565 (E.D. Tex.), *aff'd,* 429 F.3d 125 (5th Cir. 2005).

In determining the propriety of class treatment, the question is not whether plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Flowserve,* 572 F.3d at 229 (citations omitted). The denial of class certification does not prevent a plaintiff from proceeding individually. And "the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder." *Id., quoting Unger,* 401 F.3d at 323; *see also Oscar,* 487 F.3d at 269 n. 40 (loss causation, as an

10

element of a 10b-5 claim, may be reexamined at summary judgment).

IV.     **Rule 23 Analysis**

To certify a class, the court must find that Plaintiffs have established that all of Fed. R. Civ. P. 23(a)'s requirements are met, and that at least one requirement of Fed. R. Civ. P. 23(b) is also met.  The court will examine each of the relevant factors below:

A.      **Rule 23(a) Requirements**

Rule 23(a) requires that 1) the class be so numerous that joinder of all members is impracticable (numerosity); 2) there are questions of law or fact common to the class (commonality); 3) the claims or defenses of the representative parties be typical of the claims or defenses of the class (typicality); and 4) the representative parties fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P. 23(a).  Each requirement will be discussed separately as follows:

1.      **Numerosity**

The numerosity requirement is met if the plaintiff provides some evidence of a reasonable numerical estimate of purported class members.  *James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir. 2001), *cert. denied,* 534 U.S. 1113 (2002); *Pederson v. La. State Univ.,* 213 F.3d 858, 868 (5th Cir. 2000).  Lead Plaintiffs state that although they do not know the exact number of class members, as of May 2000 IVB had approximately 32 million shares outstanding, and that potential class members are

scattered across the country.  Lead Plaintiffs have also presented evidence that during the proposed Class Period, average reported daily trading volume for IVB stock was 644,000 shares.  Moreover, it is generally presumed that Rule 23(a)(1) has been met in suits involving nationally traded securities.  *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039 (5th Cir. 1981).  Defendants have not disputed Lead Plaintiffs' assertion that the numerosity requirement has been met.  The court finds the numerosity requirement to be satisfied in the instant case.

## 2.    Commonality

To show commonality, the plaintiff must allege that there exist "questions of law or fact common to the class."  *James,* 254 F.3d at 570; *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir. 1999).  The threshold for commonality is not high.  *Id., citing Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993).  The plaintiff need only show that there is one common question of law or fact.  *James,* 254 F.3d at 570.  The interests and claims of each plaintiff need not be identical.  *Id.* The commonality test is met where there is at least one issue whose resolution will affect all or a significant number of the putative class members.  *Id., citing Forbush,* 994 F.2d at 1106.  Although some plaintiffs may have different claims, or claims calling for individualized analysis, this fact is not fatal to commonality.  *Id.*

Here, a review of Lead Plaintiffs' live pleading shows that the Remanded Claims are common to all of the possible class members, and Defendants do not

12

dispute this contention.  Because Lead Plaintiffs have shown that there is at least one common question of law or fact between all potential class members, the court finds that the Rule 23(a) commonality requirement is met here.  *See James,* 254 F.3d at 570 (common legal theories of liability between plaintiffs met Rule 23(a) commonality standard).

### 3.      Typicality

To meet the typicality requirement of Rule 23(a)(3), the claims or defenses of the parties must be typical of the claims or defenses of the class.  *James,* 254 F.3d at 571; *Mullen,* 186 F.3d at 625.  This test focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.  *Id.; Mullen,* 186 F.3d at 625; *Forbush,* 994 F.2d at 1106.  The critical inquiry is whether the class representative's claims "have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."  *Id., citing* 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.24[4] (3d ed. 2000).

The Remanded Claims arise from a common course of conduct and each of the putative class members would bring claims based upon that alleged conduct under the same legal theories.  More specifically, Lead Plaintiffs and the potential class members all invested in IVB stock during the proposed Class Period, and will all bring claims

related to IVB's revenue recognition practices under SOP 97-2, and certain alleged fraudulent earnings projections and representations about the success of the merger based upon statements purportedly made by Defendants Hammond and/or Graham. Moreover, Defendants do not contest Lead Plaintiffs' assertion that the typicality requirement has been met.  Accordingly, Lead Plaintiffs' claims are typical of those of the class, meeting the Rule 23(a)(3) standard.

### 4.      Adequacy

Under Rule 23(a)(4), the court must find that the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *James,* 254 F.3d at 571.  "Differences between the named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *James,* 254 F.3d at 571, *citing Mullen,* 186 F.3d at 625-26.   To satisfy the requirements of Rule 23(a)(4), Lead Plaintiffs must show that 1) there are no conflicts of interest between them and the class they seek to represent; 2) Lead Plaintiffs have the willingness and ability to play an active role in the litigation and vigorously represent the class, while protecting the interests of the absentee class members; and 3) that the class counsel has the competence and ability to vigorously conduct the litigation.  *Feder v. Electronic Data Systems Corp.,* 429 F.3d 125, 129-30 (5th Cir. 2005); *Berger,* 257 F.3d at 479-80.

14

In this case, Defendants do not dispute Lead Plaintiffs' contention that Lead Plaintiffs will fairly and adequately represent the interests of all class members. In support of their position, Lead Plaintiffs state that there are no conflicts of interest between them and the proposed class members. All class members (including Lead Plaintiffs) will bring claims based upon the same conduct and under the same legal theories, claiming that due to Defendants' alleged conduct, they purchased IVB stock at artificially inflated prices and suffered damages thereafter when IVB's stock price fell. Lead Plaintiffs further argue that they have already been vigorously prosecuting this case, and therefore meet the second Rule 23(a)(4) adequacy requirement. Finally, Lead Plaintiffs assert that their attorneys have considerable experience litigating securities fraud class actions, and have previously been appointed lead counsel in hundreds of securities class action cases, making the attorneys qualified to adequately litigate the claims of the class members before this court. The court agrees with the parties that Rule 23(a)(4)'s adequacy requirement has been met here.

### B.    Rule 23(b) Requirements

Lead Plaintiffs contend that the class should be certified because, in addition to the requirements of Rule 23(a), they have also met the requirements of Rule 23(b)(3), which states that a class may be certified where common issues of law or fact "predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient

15

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3); *Unger,* 401 F.3d at 320.

These requirements are commonly known as "predominance" and "superiority."

### 1.      Predominance/Fraud on the Market

Before granting class certification, the district court must determine that the

individual class members' fraud claims are not dependent upon proving individual

reliance.  *Unger,* 401 F.3d at 321.   As is stated above, the party seeking class

certification has the burden of proof.    *Berger,* 257 F.3d at 479 n.4. If the

circumstances of each plaintiff's alleged reliance on fraudulent representations differ,

then each individual plaintiff will have to prove reliance and the proposed class does

not meet Fed. R. Civ. P. 23(b)(3)'s predominance requirement.  *Unger,* 401 F.3d at

321-22, *citing Castano,* 84 F.3d at 745.   However, a proposed class in a securities

fraud class action such as this case may establish predominance by availing itself of

the class-wide presumption of reliance permitted by the fraud-on-the-market theory

recognized in *Basic Inc. v. Levinson,* 485 U.S. 224(1988).  *Bell v. Ascendant Solutions,*

*Inc.,* 422 F.3d 307, 310 (5th Cir. 2005).

The fraud-on-the-market theory permits investors who cannot satisfy the

traditional requirement of proving actual reliance on a fraudulent representation (i.e.,

those investors who did not read the documents or hear the statements alleged to

contain the fraudulent representations) to maintain their fraud claims by

'"interpreting the reliance requirement to mean reliance on the integrity of the market

16

price rather than reliance on the challenged disclosure."' *Id.* at 422 F.3d at 310 n.2, *quoting* Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory,* 74 Cornell L. Rev. 907, 908 (1989). To rely on the fraud-on-the-market presumption, the plaintiffs must show that 1) the defendant made public material misrepresentations; 2) the defendant's shares were traded in an efficient market; and 3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. *Greenberg,* 364 F.3d at 661, *citing Basic,* 485 U.S. at 248 n.27. When considering class certification based upon a fraud-on-the-market theory, the court "must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence." *Bell,* 422 F.3d at 313 n.11, *citing Unger,* 401 F.3d at 325. However, after *Oscar,* it is clear that there is now a fourth element added to the above three requirements. Lead Plaintiffs must show not only that the market was efficient, but that the alleged misrepresentations actually caused their losses. This requirement carries with it an evidentiary burden that any such showing be made by a preponderance of the evidence.

> a.   First and Third Factors – Material
> Misrepresentations and Trading Shares

Here it is undisputed that Lead Plaintiffs traded shares of IVB between the time of the alleged misrepresentations and the June 6, 2000 announcement of decreased earnings per share, thus meeting the third prong of the fraud-on-the-market

test. However, Defendants argue that Lead Plaintiffs have provided no proof that they made any of the alleged statements regarding EPS during the December 16, 1999 conference call and/or the April 12, 2000 conference call, and therefore Lead Plaintiffs will not be able to establish loss causation by a preponderance of the evidence with respect to these claims. The court agrees.

Defendant's expert states in his report that upon review of the transcripts from these conference calls, he found no statements by Defendants Hammond and/or Graham predicting FY01 EPS of $1.25 or $1.26 per share. Lead Plaintiffs have not provided these transcripts or any other proof that these statements were made during the December 16, 1999 and/or April 12, 2000 conference calls. Instead, they rely upon the bare allegations of their pleadings that Hammond and/or Graham made these purported representations.

Allegations in pleadings are not evidence. *In re Grand Jury Subpoena,* 419 F.3d 329, 335 (5th Cir. 2005); *Anderson v. Siemens Corp.,* 335 F.3d 466, 474 n.15 (5th Cir. 2003). Plaintiffs are charged with establishing loss causation by a preponderance of the evidence. *Flowserve,* 572 F.3d at 228. If they cannot present any evidence that the alleged false or misleading statements were made, it follows that they cannot show by a preponderance of the evidence that such statements caused their losses. Therefore, at this stage the court determines based upon the evidence and the pleadings that to the extent necessary for class certification purposes, the first prong

18

of the fraud-on-the-market theory has not been satisfied as to Lead Plaintiffs' forecast-related claims.

### b. Second Factor – Efficient Market

The fraud-on-the-market theory assumes that in an efficient market, the market price of a stock reflects all public information, so that an investor who purchases a stock in such a market is harmed if the price of that stock reflects false information as a consequence of a material misrepresentation. *Bell,* 422 F.3d at 310 n.2. In such a market, misleading information will presumably defraud investors even if those purchasers have not directly relied on the misstatements. *Unger,* 401 F.3d at 322, *citing Basic,* 485 U.S. at 241-42. Therefore, to take advantage of this presumption of reliance, a securities fraud plaintiff must show that the stock at issue is traded in an "efficient market." *Unger,* 401 F.3d at 322.

Courts examine the following factors in making a determination of market efficiency: 1) the average weekly trading volume expressed as a percentage of outstanding shares; 2) the number of securities analysts following and reporting on the stock; 3) the extent to which market makers and arbitrageurs trade in the stock; 4) the company's eligibility to file SEC registration Form S-3 (as opposed for Form S-1 or S-2); 5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; 6) the company's market capitalization; 7) the bid-ask spread for

19

stock sales; and 8) float, the stock's trading volume without counting insider-owned stock. *Bell,* 422 F.3d at 313 n.9; *Unger,* 401 F.3d at 323, *both citing Cammer v. Bloom,* 711 F. Supp. 1264, 1286-87 (D. N.J. 1989).   These factors must be "weighed analytically" by the district court, because they each represent a different facet of market efficiency. *Unger,* 401 F.3d at 323.

## I.      Average Trading Volume

A large weekly volume of stock trades suggests significant investor interest in a company, and implies that many investors are executing trades on the basis of newly available or disseminated corporate information. *Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Cammer,* 711 F. Supp. at 1286; *see also Unger,* 401 F.3d at 324 (a high weekly stock trading volume suggests the presence of active, informed investors).   Average trading volume is one of the strongest factors in gauging the efficiency of the market. *Krogman,* 202 F.R.D. at 474, *citing Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1122 (5th Cir. 1988), and  *Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 360 n.8 (5th Cir. 1987).   Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption. *Id., citing Cammer,* 711 F. Supp. At 1286.   Here, Lead Plaintiffs have shown that IVB stock traded at an average weekly volume of over three million shares during the proposed Class Period.   This trading volume represented over 9% of IVB's

outstanding shares, which is greatly in excess of the 1-2% minimum trading volume courts have found to support a finding of market efficiency.   Defendants do not dispute this figure.  Because IVB stock was actively traded during the Class Period, this evidence weighs in favor of a finding of market efficiency.

### ii.      Reporting on Stock by Securities Analysts

The number of securities analysts who review and report on a company's stock can increase the likelihood that information disseminated by the corporation is relied upon by the stock trading public.  *Krogman,* 202 F.R.D. at 475; *Cammer,* 711 F. Supp. at 1286.  A showing that a substantial number of analysts followed the stock shows that it was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based upon information publicly available about the company.  *Krogman,* 202 F.R.D. at 475; *see also Lehocky,* 220 F.R.D. at 508 (greater number of securities analysts covering a security makes it more likely that investors have relied on disseminated information).  In this case, Lead Plaintiffs point to evidence showing that during the Class Period, twelve different securities analysts covered and reported on IVB stock, including several well-known brokerage firms. Defendants do not dispute this proof of analyst coverage or argue that the number of analysts cited by Lead Plaintiffs is insufficient to establish a finding of market efficiency.  Based upon this information, the court finds that this factor also supports a finding that IVB stock traded in an efficient market.

### iii.    Market Maker Activity

Although the number of market makers as an indicator of market efficiency has been strongly criticized (and is given little weight) by the courts, this factor still may be considered in conjunction with their volume of trading activity.  *Unger,* 401 F.3d at 324; *Krogman,* 202 F.R.D. at 476.   A market maker is a firm that makes a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at these publicly-quoted prices.  *Lehocky,* 220 F.R.D. at 508 n.24.   Market makers are generally large brokerage houses that trade in a specific number of shares at a specific price.  *Griffin v. GK Intelligent Sys., Inc.,* 196 F.R.D. 298, 303 (S.D. Tex. 2000), *citing O'Neil v. Appel,* 165 F.R.D. 479, 501 (W.D. Mich. 1996).   However, the mere presence of market makers does not indicate market efficiency.  *Krogman,* 202 F.R.D. at 476, *citing O'Neil,* 165 F.R.D. at 501-02.   What is important is "'the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so.'"  *Id., quoting O'Neil,* 165 F.R.D. at 502. Evidence of the number of market makers alone has limited probative value for purposes of determining market efficiency.  *Griffin,* 196 F.R.D. at 304.

Lead Plaintiffs assert that during 1999 and 2000, over 225 firms acted as market makers in IVB stock.  Their expert's report further shows that many of those market makers traded IVB stock in high volumes.  Therefore, the court finds that this

market maker activity also weighs in favor of finding that IVB's stock traded in an efficient market.

### iv.    Eligibility to File Form S-3

Form S-3 is a short form for the registration of securities that a company may use if certain registrant and transaction requirements are met.  17 C.F.R. § 239.13.  A company that has filed monthly reports with the SEC for one year and has common equity held by non-affiliates of the registrant in excess of $75 million is eligible to file Form S-3.  *Id.; Oscar,* 2005 WL 877936 at *10.  Only corporations whose stocks are actively traded and widely followed are allowed by the SEC to file Form S-3. *O'Neil,* 165 F.R.D. at 502; *Krogman,* 202 F.R.D. at 476.  Courts have recognized eligibility for filing of an S-3 Registration Statement as a factor indicating market efficiency, reasoning that the SEC permits companies to file an S-3 upon the premise that the stock is traded in an open and efficient market, such that further disclosure is unnecessary.  *Krogman,* 202 F.R.D. at 476, *citing O'Neil,* 165 F.R.D. at 502, and *Cammer,* 711 F.Supp. at 1287.  Lead Plaintiffs have shown that IVB was eligible to file Form S-3 during the entire Class Period.  Defendants do not dispute this information.  Accordingly, IVB's eligibility to file an S-3 Registration Statement weighs in favor of a finding of market efficiency.

### v.    Reaction of the Stock Price to New Material Information

Evidence of a causal relationship between unexpected corporate events or

financial releases and an immediate response in the price of the stock is an important indicator of market efficiency.  *Id.* At 477; *Cammer,* 711 F. Supp. at 1287.   Some courts have stated that this factor is paramount to the others in a determination of market efficiency.  *See Unger,* 401 F.3d at 324 (causal connection between stock price and corporate events goes to the heart of the fraud-on-the-market theory); *Cammer,* 711 F. Supp. at 1287 (this factor is "the essence of an efficient market and the foundation for the fraud on the market theory"); *In re 2TheMart.com, Inc.,* 114 F. Supp.2d 955, 964 (C.D. Cal. 2000) (fifth *Cammer* factor may be most important to evaluation of market efficiency).   In an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly when the market receives new and unexpected information.  *Unger,* 401 F.3d at 324; *Krogman,* 202 F.R.D. at 477.  However, many variables could potentially impact share price, such as the daily market average, national, local, and industry-specific economic news, and competitors' activities.  *Unger,* 401 F.3d at 325.   Facts showing a rapid change in share price after positive or negative company news  are "no doubt worthwhile, but standing alone [are] insufficiently probative to determine" that a causal connection exists.  *Id.*

Through their expert report, Lead Plaintiffs have shown that after IVB reported on June 6, 2000 that it would report a loss of $0.03 to $0.05 per share for the first fiscal quarter of 2001 (which ended May 31, 2000), IVB's stock declined almost 55%

by the close of the market the following day.  Based on this evidence, Lead Plaintiffs assert that the quick response in the stock price (a 55% price drop in one day) to this material disclosure supports a finding of market efficiency.  Defendants argue that this proof is insufficient because Lead Plaintiffs' expert provides no independent statistical analysis, does not compare the market reaction following the above press release to the market reaction following other announcements by IVB, and does not consider whether other events or information could have impacted the stock price.

The court agrees that Lead Plaintiffs' expert could have more thoroughly analyzed this factor.  By limiting his analysis to only one announcement and corresponding reaction in the stock price, the expert failed to consider the other factors identified by the Fifth Circuit as potentially impacting share price, such as the daily market average, national, local and industry-specific economic news, and competitor's activities.  *Unger,* 401 F.3d at 325.  While the June 6 announcement and subsequent June 7 price drop are certainly supportive of a finding that the market was efficient, the expert analysis provided by Lead Plaintiffs is simply too conclusory.  Thus, the prompt drop in the stock price on June 7 cannot alone be a conclusive indicator of market efficiency.  While this evidence weighs slightly toward a finding of market efficiency, it can only be considered for its contribution to the overall weighing of the eight relevant factors, and in this case cannot be considered as "paramount" proof of an efficient market.

### vi.    Market Capitalization

Market capitalization is another indicator of market efficiency.  *Unger,* 401 F.3d at 325 n.7; *Krogman,* 202 F.R.D. at 478.  Market capitalization is calculated as the number of shares multiplied by the prevailing share price, and may indicate market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.  *Krogman,* 202 F.R.D. at 478, *citing O'Neil,* 165 F.R.D. at 503.  Investors are more confident investing in corporations with large market capitalizations because "large firm size and dollar trading volume tend to reflect the magnitude of economic incentive to eliminate mispricing."  *O'Neil,* 165 F.R.D. at 503.  Lead Plaintiffs state that during the Class Period, IVB had a large market capitalization ranging from $300 million to $1.2 billion.  Defendants do not contest these figures.  The court agrees with Lead Plaintiffs that IVB's large market capitalization weighs in favor of a finding that IVB stock was traded in an efficient market.

### vii.    Bid-Ask Spread

The court should also consider the bid-ask spread for the stock at issue when determining whether it traded in an efficient market.  *Unger,* 401 F.3d at 325 n.7. The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to buy their shares.  *Krogman,* 202 F.R.D. at 478.  A large bid-ask spread suggests inefficiency,

because the stock is too expensive to trade. *Id.* Lead Plaintiffs' expert has calculated the bid-ask spread for IVB stock at 0.5% of the price, which he describes as a low bid-ask spread. The court agrees that this proof supports the conclusion that the market for IVB stock was efficient.

### viii.    Float

Float is the percentage of a corporation's shares that are held by the public as opposed to insiders. *Id.* At 478; *O'Neil,* 165 F.R.D. at 503. Prices of stocks that have greater holdings by insiders as opposed to the public are less likely to reflect all available information about the security. *Id.* Lead Plaintiffs have provided evidence showing that the market value of public float for IVB stock ranged from $275 million to $1.1 billion. Defendants do not dispute the facts showing that IVB had a large float. Therefore, the court finds that IVB's large public float weighs in favor of a finding of market efficiency.

### ix.    Summary – Market Efficiency

To summarize, Lead Plaintiffs have shown that during the Class Period:

- IVB stock had a high weekly trading volume;

- at least twelve securities analysts followed and reported on the stock;

- there were numerous market makers in the stock who traded in large quantities;

- IVB was eligible to file SEC Form S-3 throughout the Class Period; and

- that IVB had a low bid-ask spread, a large market capitalization, and a large public float.

Lead Plaintiffs have further shown that the price of IVB stock declined sharply immediately following an announcement that the company's 1Q01 earnings per share would be far below expectations.   After weighing all of these factors, the court concludes that Lead Plaintiffs have shown the market to be efficient.   However, as the court has stated above, the first element of the fraud-on-the-market theory was not satisfied by Lead Plaintiffs with respect to their forecast-related claims, although the first and third elements of the fraud-on-the-market theory have been met with regard to the other Remanded Claims.   As with Lead Plaintiffs' forecast-related claims Defendants assert that Lead Plaintiffs cannot establish predominance with respect to their merger-related and revenue recognition claims because they have not proven loss causation by a preponderance of the evidence.   The court agrees.

> d.   **Additional Burden – Proof of Loss Causation, and Defendants' Rebuttal of the Fraud on the Market Presumption**

Defendants contend that even if the fraud-on-the-market presumption is applied, Lead Plaintiffs still cannot meet the predominance requirement, because they have not established loss causation as required by *Oscar*.

## I.   Legal Standards for Loss Causation Analysis

In *Oscar*, the Fifth Circuit expressed its view that it had "tighten[ed]" the requirements for plaintiffs seeking a presumption of reliance, by requiring not only proof of a material misstatement, but further proof that the alleged misstatement *actually moved* the market. *Oscar,* 487 F.3d at 265 (emphasis in original); *see also Flowserve,* 572 F.3d at 228 (most notably, plaintiff must prove that the defendant's non-disclosure materially affected the security's market price) (citation omitted).  The court further stated that "essentially, we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption." *Id.; see also Flowserve,* 572 F.3d at 228.

In *Oscar,* the court emphasized that the loss causation question is not reserved exclusively for the merits stage of a case, noting that the efficient market doctrine permits "an extraordinary aggregation of claims" that justifies advancing Lead Plaintiffs' evidentiary burden to the class certification stage.  *Id.* at 266-67.  Believing that an order for class certification bestows upon plaintiffs extraordinary leverage, the court rejected the plaintiffs' contention that at the class certification stage, it was inappropriate to address loss causation beyond a generalized inquiry into whether the alleged misrepresentation moved the stock.  *Id.* at 267-69.   Rather, it determined that the court must "find" rather than assume certain facts supporting class certification, and those facts must support a finding of loss causation by a

29

preponderance of admissible evidence.  *Id.; Flowserve,* 572 F.3d at 228.

To establish loss causation, Plaintiffs can show that an alleged misrepresentation actually affected the market in one of two ways: 1) demonstrating an increase in the stock price after the release of false positive news; or 2) demonstrating a decrease in price following a corrective disclosure.  When relying on a decrease in stock price, as  Lead Plaintiffs do here, plaintiffs must demonstrate that the stock price declined due to the revelation of the truth and not the release of other unrelated negative information.  *Id.*

More specifically, Lead Plaintiffs must show that 1) the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier; and 2) that it is more probable than not that it was *this* negative statement, and not other *unrelated* negative statements, that caused a significant amount of the decline.  *Id.* at 266 (emphasis added); *Flowserve,* 572 F.3d at 228, *citing Greenberg,* 364 F.3d at 666.   The loss must occur because this new truth emerged in the marketplace, not as a result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or other reasons unrelated to the alleged fraud.  *Flowserve,* 572 F.3d at 229, *citing Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342-43 (2005).

30

As stated above, Plaintiffs who choose to rely on stock price to establish class-wide reliance must also show that the initial false statement causing the stock price to increase and the later corrective disclosure causing the decrease were factually related. *Greenberg,* 364 F.3d at 665; *Oscar,* 487 F.3d at 266.  A sudden and significant drop in stock price alone will not suffice to show that the purported fraudulent statements actually moved the market price of a defendant's stock. *Fener v. Belo Corp.,* 579 F.3d 401, 410 (5th Cir. 2009). "'[T]o be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation.'" *Flowserve,* 572 F.3d at 230, *quoting In re Williams Sec. Litig. – WCG Subclass,* 558 F.3d 1130, 1140 (10th Cir. 2009).  "Fact for fact" disclosure is not required.  *Flowserve,* 527 F.3d at 230.  However, a "'loss caused solely by a general impression in the market that something is wrong'" does not establish loss causation.  *Id.* at 232, *quoting Williams,* 558 F.3d at 1138.

ii.     **Lead Plaintiffs' Loss Causation Evidence and Defendants' Rebuttal**

In support of their argument that Defendants' alleged misrepresentations caused their losses, Lead Plaintiffs rely on the testimony and analysis of their expert Bjorn Steinholt ("Steinholt").   To begin, Steinholt assumes that Lead Plaintiffs' liability allegations are true, and premises his analysis on the presumed truth of those accusations.    Steinholt assumes that Defendants failed to disclose information concerning problems related to the merger (and customer transitions related thereto). He further assumes  that Defendants misrepresented IVB's  anticipated  revenue  and

earnings, which were, according to Lead Plaintiffs, higher than they should have been due to IVB's alleged faulty revenue recognition practices.

Steinholt has identified no statistically significant stock price increases following any of the alleged statements that are the basis for the Remanded Claims, and in fact, acknowledges that following the alleged April 12, 2000 statement, IVB's stock declined 10 percent, although he contends that this decrease was not statistically significant.  Instead, he repeatedly states that the statements at issue failed to disclose IVB's true financial condition.  Although Steinholt discusses a rise in IVB's stock price over the Class Period, he supports this price increase with evidence of analyst statements.  Both this court and the Fifth Circuit has already deemed Lead Plaintiffs' claims based upon analyst statements not actionable.  Further, Steinholt does not specifically associate the general price increase during the Class Period with any purported fraudulent statements.

Instead, Steinholt posits that the June 7, 2000 stock plummet was due to IVB's revelation of its "true" financial results and prospects, and that therefore, the stock price had to have been inflated prior to that time by the supposed failure to disclose the company's financial reality.  Although Steinholt relies solely upon the June 7, 2000 decline to support Lead Plaintiffs' attempt to show loss causation, he does not factually connect any of the revelations made on June 6, 2000 to any of the alleged prior misstatements.  Rather than state that the June 6 announcement

32

corrected those prior misstatements, Steinholt says that the June 6 announcement "*effectively* disclosed" the "relevant truth" that was concealed by the alleged fraud (emphasis added).

Boiled down to its essence, Steinholt's reasoning is that any major drop in stock price indicates that there must have been some prior mistruths that are now corrected or exposed, whether or not the disclosure preceding that precipitous drop has any relationship to those alleged false statements.  Thus, Steinholt asserts that to show loss causation, a litigant must merely identify a disclosure followed by a large price drop, regardless of whether that disclosure has any factual nexus to the earlier representations that allegedly caused the price of that security to become falsely inflated.  In the court's view, this approach is similar to that rejected by the Fifth and Tenth Circuits in *Flowserve* and *Williams.  See Flowserve,* 572 F.3d at 232 (general impression in the market that "something is wrong" is insufficient to establish loss causation); *Williams,* 558 F.3d at 1138 (same).

In response to Steinholt's declaration, Defendants rely upon the testimony and analysis of Dr. Christopher Barry ("Barry").  Barry begins his critique of Lead Plaintiffs' evidence by stating that he found no statements by Hammond and/or Graham forecasting FY01 EPS when he reviewed the December 16, 1999 and April 12, 2000 conference call transcripts.  Lead Plaintiffs have not responded with evidence (through transcripts or otherwise) supporting these critical allegations.

33

Although there were FY01 EPS forecasts made around those time frames, those statements were made by analysts, and any claims based upon those statements have previously been dismissed from the case.

Barry's main critique of Steinholt's analysis is that Steinholt's claim that the June 6, 2000 announcement revealed IVB's "true financial performance and prospects" cannot suffice to show that the content of that announcement was factually related to the earlier alleged misstatements.  Moreover, Barry contends that Steinholt too narrowly relies on Plaintiffs' unproven assertions rather than examining "the total  mix" of information that was known to investors in the marketplace during the Class Period, so that it can be determined whether any given piece of information was truly new and substantially changed the information mix, thus causing a significant stock price decline.

Specifically, Barry points out that if the misrepresented facts regarding FY01 EPS inflated IVB's stock price, there would need to be a more specific revelation that those prior statements were untrue for that revelation to "undo" the inflation caused by the earlier misrepresentations, thus causing the price to dramatically tumble.  Similarly, with respect to the merger-related statements, Barry points to Steinholt's assumptions that Defendants knew prior to June 6, 2000 that IVB was experiencing integration-related problems, that the market was unaware of such problems, and that the June 6, 2000 disclosure therefore revealed integration issues that were previously

34

unknown to the market.  Barry states that reliance upon these assumptions, plus the June 7, 2000 stock price decline, is insufficient to prove loss causation because the June 6, 2000 press release does not refer to or correct any of the prior merger-related statements relied upon by Lead Plaintiffs.

Finally, with respect to the allegedly overstated revenues and earnings (the revenue recognition claims), Barry points out that, as stated above, there was no statistically significant increase in IVB's stock price following any of the alleged false statement, and thus the June 6 announcement could not have removed any price inflation flowing from those statements.  He also states that the June 6, 2000 press release makes no reference to prior misstated revenues or earnings, and does not correct or revise any earlier earnings that were supposedly misreported.  Therefore, IVB's June 6 announcement did not remove any price inflation that may have occurred due to an alleged prior overstatement of revenues and earnings.  Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.

Further, as Lead Plaintiffs themselves admit in their Complaint, the "truth" concerning the revenue recognition problems were admitted by IVB later on, in announcements made on June 22 and July 11, 2000.  In those announcements, IVB stated that it was incorporating accounting changes based on SAB 101.  When this

new accounting-related information was released to the market on those days, there was no negative impact in IVB's share price.  Accordingly, Barry contends that Lead Plaintiffs cannot rely upon the June 6, 2000 press release to establish loss causation with respect to the revenue recognition claims.  *See also Flowserve,* 572 F.3d at 230 (only information that is known to the market is relevant under fraud-on-the-market theory).

### iii.    Analysis

In the instant case, the Fifth Circuit instructed this court to examine whether Lead Plaintiffs have adequately demonstrated loss causation by a preponderance of all admissible evidence, before Plaintiffs would be permitted to rely on the fraud-on-the-market presumption to demonstrate that class-wide issues of reliance predominate. As the court stated above, the parties have supplemented their prior filings concerning class certification due to the burden articulated in *Oscar and Flowserve.* This proof consists mainly of the respective experts' analyses discussed above.  As described above, the Remanded Claims consist of various alleged false statements regarding earnings forecasts and the success of the merger, plus claims related to IVB's revenue recognition procedures (*see* Complaint, ¶¶ 11, 41, 61-62, 71, and 89-91).  The court will look at the evidence presented regarding each of the Remanded Claims, checking for relatedness to the corrective disclosures made on June 6, 2000.

**Complaint ¶ 41: Conference Call – 12/16/99**

Lead Plaintiffs allege that during a conference call on December 16, 1999, Hammond and/or Graham provided a fraudulent projection concerning FY01 earnings per share of $1.25.  During this same call, it is also alleged that statements were made that the merger was "progressing nicely."  Lead Plaintiffs further allege that Defendants falsely represented that former Brite customers were transitioning to InterVoice's NT IVR platform, when actually some customers were instead choosing to adopt competitor technology.  Defendants argue that these statements cannot be relied upon as proof of loss causation because they do not relate  to the June 6, 2000 announcement, which released information concerning 1Q01 financial results, not FY01 results.  However, as Lead Plaintiffs point out, the June 6 announcement did go on to state that the 1Q01 earnings shortfall was unlikely to be recovered in FY01, and therefore the press release does contain information regarding FY01 earnings forecasts.  Defendants also contend that the June 6 press release contained no new information regarding the merger-related statements at issue in this case.  Rather, the new merger-related information provided by the June 6 disclosure attributed the 1Q01 earnings miss to attrition in IVB's sales force.

The court agrees that these alleged statements about the merger fail to meet the relatedness test imposed by *Oscar,* and therefore the loss causation requirement is not met with regard to this group of claims.  Further, Defendants' evidence shows

that the market already was aware of the customer transition issues as early as December 17, 1999.  However, the June 6, 2000 press release did newly reveal that IVB's earnings forecast for FY01 was in doubt, given the magnitude of the 1Q01 shortfall.  Had Lead Plaintiffs set forth any proof that these alleged FY01 earnings predictions were actually made on December 16, 1999 (which they have not), the inclusion of this information regarding FY01 results in the June 6 press release could have been a sufficient link to the earlier statements for loss causation purposes.  However, as it stands, Lead Plaintiffs have failed to show by a preponderance of the evidence that the June 6, 2000 press release revealed any prior untruths set forth on December 16, 1999 that ultimately caused them to incur a loss.

### Complaint ¶¶ 61-62: Conference Call 4/12/00

Lead Plaintiffs next allege that Defendants made more merger and earnings-forecast related false statements during a conference call held April 12, 2000.  Lead Plaintiffs contend that during that call and in follow-up conversations with analysts, Hammond and Graham said that the outlook for Business Systems was improving, and that IVB remained on track to report FY01 EPS of $1.26.  As noted above, although the June 6 statement does indirectly address FY01 EPS, Lead Plaintiffs have not provided evidence that the alleged April 12, 2000 statement was made.  Further, that press release does not correct any prior misstatements regarding the outlook for Business Systems.  Accordingly, the court cannot find that these alleged statements

are related to any information set forth on June 6 that caused the price of IVB's stock to tumble.   Plaintiffs have failed to prove loss causation with regard to these allegations.

### Complaint ¶ 71: May 2000 Road Show Statements

Lead Plaintiffs' next set of allegations are relatively vague.   Lead Plaintiffs allege that during a road show for institutional holders, Hammond and Graham made statements "promoting the sales pipeline" and reporting that the "merger was going well."   Nothing in the June 6, 2000 press release reveals that these vague statements were untrue.   There is no announcement in the June 6 disclosure that the merger had failed, and while Defendants did state on June 6 that failure to close certain sales opportunities had contributed to the 1Q01 earnings shortfall, Lead Plaintiffs' allegation that Hammond and Graham were "promoting the sales pipeline" one month earlier is so vague, it cannot be said that the "truth" of this statement was revealed through the June 6 announcement that sales had been less than expected in 1Q01.   The court finds again that the requisite causal link is missing between the information released by IVB on June 6, 2000, and the earlier purported false and misleading statements.

### Complaint ¶¶ 89-91: Revenue Recognition Policy

The remaining Remanded Claims relate to alleged accounting misstatements by Defendants during the Class Period.   Specifically, Lead Plaintiffs allege that IVB

falsely reported its revenues and earnings for the company's quarters ended August 31, 1999 (2Q00), November 30, 1999 (3Q00) and its fiscal year-end on February 29, 2000.  These overstatements were allegedly repeated in conference calls on October 13, 1999, December 16, 1999, and April 12, 2000.  Lead Plaintiffs state in their Complaint that these financial overstatements resulted from IVB's practice of recognizing revenue upon shipment of their software, rather than upon installation and customer acceptance, as required by their sales contracts.  Therefore, Lead Plaintiffs state that this revenue recognition policy violated GAAP and SOP 97-2. Neither Steinholt nor Barry identifies any statistically significant stock price increases following the alleged falsely stated revenues and earnings.  In fact, Barry notes that following the April 12, 2000 overstatement, IVB's stock price actually declined by more than 10 percent, which mitigates Lead Plaintiffs' claim that unduly positive news falsely inflated the share price.

According to Lead Plaintiffs, Defendants admitted the overstatement of revenues and earnings when IVB announced on June 22, 2000 that it would change its revenue recognition policy to recognize sales upon customer acceptance rather than upon shipment, by implementing SAB 101 effective 1Q01.  (Complaint at ¶ 11).  There was no change in IVB's stock price following this announcement.  A few weeks later, on July 11, 2000, IVB issued a press release stating that it had adopted SAB 101, and as a result the company would take a $11.3 million charge against

earnings in 1Q01. (*Id.* at ¶ 86). Following the July 11 announcement, IVB's share priced increased approximately 3%.

Lead Plaintiffs assert in their pleadings that the negative information regarding IVB's revenue recognition practices was revealed to the market no earlier than June 22, 2000. Accordingly, this information could not have caused the dramatic price decrease that occurred on June 7, 2000. Moreover, the June 6, 2000 press release makes no reference to previously SOP 97-2, SAB 101, or any other correction of previously overstated revenues due to its premature recognition of revenues upon shipment. Based upon this chronology of events, the court finds that Lead Plaintiffs have failed to carry their burden of establishing loss causation related to their revenue recognition claims.

Because Lead Plaintiffs have not established loss causation by a preponderance of the evidence, they cannot rely on a class-wide presumption of reliance as provided by the fraud-on-the-market theory. Therefore, due to this failure of proof as demanded by *Oscar* and *Flowserve,* the court is forced to conclude that individual issues of reliance and causation will predominate, and this case is not appropriately treated as a class action because it does not meet the predominance requirement of Fed. R. Civ. P. 23(b).

### 2.     Superiority

Although the court has determined that Lead Plaintiffs have not carried their

critical burden of establishing that Defendants' alleged false statements actually caused their losses, the court will, in the interest of completeness, briefly discuss the second element of Rule 23(b), superiority.  Class actions are considered superior when individual actions would be wasteful, duplicative, present managerial difficulty and be adverse to judicial economy.  *Mullen,* 186 F.3d at 627.  The court also considers whether class treatment of a case will "'achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.'" *Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 570 (S.D. Tex. 2000), *quoting State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 315 (5th Cir. 1978).

The four factors to be considered with respect to the superiority requirement are found in Fed. R. Civ. P. 23(b)(3)(A)-(D).  They are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D); *Robinson v. Texas Automobile Dealers Assn.,* 387 F.3d 416, 425 (5th Cir. 2004), *cert. denied,* 544 U.S. 949 (2005).  Additionally, in considering the superiority requirement, the district court must possess an understanding of the

relevant claims, defenses, factual and legal issues, and how the case will be tried. *Feder,* 429 F.3d at 139; *Robinson,* 387 F.3d at 425.

Here, the identity of the factual and legal issues between all proposed class members makes the notion that they should be required to file hundreds or thousands of individual lawsuits illogical, and forcing them to do so would encourage a waste of judicial and private resources.  All class members' claims arise from the same course of conduct and are based upon the same legal theories.  Resolution of these claims will affect each class member similarly, and it would be economically prohibitive for many class members who suffered smaller losses to prosecute individual actions.  *See Amchem,* 521 U.S. at 617 (policy behind the class mechanism overcomes problem that small recoveries inhibit individuals from bringing solo actions to prosecute their rights).  Therefore, the first of the four superiority factors – lack of interest of each individual plaintiff in controlling the litigation –  favors maintenance of a class action here.

The court also views the second factor – the extent and nature of any litigation already commenced by class members – as supportive of a finding that class treatment is appropriate here.  The court is unaware of any other litigation related to this controversy and involving the same proposed class members, and neither party has submitted any facts showing that such parallel litigation exists.  The instant litigation has been ongoing for several years, and is well-developed.  Given the stage that this

litigation has reached, the court also finds that (under the third superiority factor) it is desirable to concentrate and continue the litigation in this forum.  By avoiding fragmentation of this case into other courts and jurisdictions, class certification will increase efficiency, decrease costs for both the proposed class and Defendants, and avert the possibility of inconsistent results.

Finally, the court does not anticipate any particular difficulties in managing this case as a class action that would disfavor such treatment.  All class members bring federal securities fraud claims and present no individually novel legal issues.  The court anticipates that at trial, the major issue would be the class's ability to establish causation with respect to their alleged losses.  The potential size of the class appears to be large enough for class certification.  Moreover, Defendants do not contest Lead Plaintiffs' assertion that the Rule 23(b) superiority requirement has been met in this case.  For all of these reasons, the court determines that a class action is the superior method for adjudication of this controversy.  *See Lehocky,* 220 F.R.D. at 511 (finding that superiority requirement was met in securities fraud case); *Longden v. Sunderman,* 123 F.R.D. 547, 558-59 (N.D. Tex. 1988) (same).  However, although Lead Plaintiffs have met the superiority requirement of Rule 23(b), the class cannot be certified because, as is stated above, they have failed to establish loss causation by a preponderance of the evidence.

## V.      Conclusion

For the foregoing reasons, Lead Plaintiffs' Motion for Class Certification is

**denied**.

**SO ORDERED**.

Signed October 26th, 2009.


_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE